JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
208–211

Page 208

```
1        IN THE UNITED STATES DISTRICT COURT,
              MIDDLE DISTRICT OF FLORIDA
2                 TAMPA DIVISION
         CASE NO.:  8:11-CV-02029-JSM-TBM
3

4   KAHAMA VI, LLC,

5                    Plaintiff,

6   vs.

7   HJH LLC, et al.,

8                    Defendants.
    _____/
9

10

11

12            DEPOSITION OF JAMES D. PARTIN
                    VOLUME 2 OF 2

13              April 8, 2014
            10:06 a.m. to 7:26 p.m.
14              Trenam Kemker
            101 East Kennedy Boulevard
15              Suite 2700
            Tampa, Florida 33602
16
    -----------------------------------
17

18

19

20

21

22  REPORTED BY:
    ELLA DEAN SAMPSON, RDR
23  Notary Public
    State of Florida at Large
24  Esquire Deposition Solutions - Tampa, Florida
    813-221-2535 (800-838-2814)
25  Job No.:  119685(B)
```

Page 209

```
1   APPEARANCES:

2        On Behalf of the Plaintiff:
         PAUL G. WERSANT, ESQUIRE
3        Sequoia Equities, Inc.
         6340 Sugarloaf Parkway
4        Suite 200
         Duluth, Georgia 30097
5        678.775.6734
         pgwersant@sequoiafinancialsolutions.com
6
         On Behalf of the Defendant Howard S. Marks:
7        JOHN AGLIANO, ESQUIRE
         Burr & Forman LLP
8        201 North Franklin Street
         Suite 3200
9        Tampa, Florida 33602
         813.221.2626
10       jagliano@burr.com

11       On Behalf of the Defendant Old Republic
         National Title Insurance Company:
12       BETH A. CRONIN, ESQUIRE
         Trenam Kemker
13       200 Central Avenue
         Suite 1600
14       St. Petersburg, Florida 33701
         727.824.6105
15       bcronin@trenam.com

16

17

18

19

20

21

22

23

24

25
```

Page 210

INDEX

                                              PAGE

Examination by Mr. Wersant...............6, 213, 335
Examination by Ms. Cronin....................314, 357
Examination by Mr. Agliano...................330, 358
Certificate of Reporter.....................203, 360
Certificate of Oath.........................204, 361
Deposition Errata Sheet.....................205, 362

Page 211

                        EXHIBITS
NO.            DESCRIPTION                        PAGE

1    Amended Notice of Deposition...................9

2    Owner's Policy...............................12

3    Loan Policy.................................29

4    1/30/08 letter to Roberts from Marks........58

5    2/7/08 letter to Marks from Roberts.........59

6    2/13/08 Email from Hew to Burnett cc Marks...76

7    3/6/08 letter to Roberts from Burnett.........77

8    3/10/08 letter to Burnett from Butler.........78

9    3/10/08 letter to Burnett from Butler.........78

10   Complaint...................................88

11   First Amended Complaint.....................103

12   2/14/11 and 2/15/11 email string............110

13   Defendant Marks First Supplement to Initial
     Privilege Log.............................133

14   7/15/08 7/15/08 letter to Conner from Marks..145

15   Notice of Lis Pendens.......................149

16   Promissory Note.............................154

17   Mortgage and Security Agreement.............154

18   Collateral Assignment of Contract and
     Contract Rights..........................154

19   Loan and Security Agreement.................154

20   Composite exhibit ORNTIC 000377-436..........186

21   Email string, ORNTIC 000437-453.............189



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
212–215

Page 212

EXHIBITS
NO.    DESCRIPTION    PAGE

22   Email string, ORNTIC 000454-456.............190

23   Email string, ORNTIC 000457-463.............214

24   Email string, ORNTIC 000521-522.............230

25   10/16/12 Email to McGinnity from Mundell;
     Mediation Agreements; Settlement Agreements;
     Declaration of Restrictive Covenants........235

26   Complaint...................................243

27   Release Agreement Between HJH and Old
     Republic....................................258

28   2/5/13 letter to the Clerk from Marks; Joint
     Voluntary Dismissal With Prejudice as to
     Defendant City of New Smyrna Beach, Florida..275

29   Third Amended Complaint.....................276

30   Old Republic's Answer and Affirmative Defenses
     To County XII of Corrected Third Amended
     Complaint...................................279

31   Volusia County's Third Amended Answer and
     Affirmative Defenses to First Amended Complaint
     and Counterclaim............................290

32   HJH v. Volusia County Final Judgment........292

33   Docket Information..........................308

34   General Warranty Deed.......................336

Page 213

The deposition of JAMES D. PARTIN was taken pursuant to Notice by counsel for the Plaintiff on the 8th day of April, 2014, commencing at 10:06 a.m., Trenam Kemker, 101 East Kennedy Boulevard, Suite 2700, Tampa, Florida. Said deposition was reported by Ella Dean Sampson, RDR, Notary Public, State of Florida at Large.
- - - - - - - - - -
WHEREUPON:

JAMES D. PARTIN,
a witness, having been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION
BY MR. WERSANT:
Q   So, I guess, Mr. Partin, you're saying that there's already a predetermined procedure with Old Republic under the owner's policy as to who would get loss proceeds between the lender and the owner?
MS. CRONIN: Objection to form.
THE WITNESS: It's in the standard policies that every title insurance company issues.
BY MR. WERSANT:
Q   Have you ever seen an owner's policy -- when you have an owner's policy and a lender's policy, as you just described -- have you ever seen an owner's policy

Page 214

without that allocation language in it --
MS. CRONIN: Objection to form.
BY MR. WERSANT:
Q   -- with Old Republic?
A   It is a standard form, and that is not altered.
Q   So you have to use it in that format?
A   Yes.
Q   Has that format, to your knowledge, changed since 2004?
MS. CRONIN: Objection to form.
THE WITNESS: No, it hasn't.
(Exhibit Number 23 was marked for identification.)
MR. WERSANT: This is Old Republic 457.
MR. AGLIANO: What was that, 23?
MS. CRONIN: This is 23.
MR. AGLIANO: Sorry.
BY MR. WERSANT:
Q   Have you seen this document before, Mr. Partin?
A   Yes.
Q   Can you identify that document for the record?
A   It's an email string ending with an email from Liz McGinnity to you dated September 20, 2012.

Page 215

Q   What's your understanding -- look at the email -- look at the email on the first page, the last one from me to her. Do you have any understanding of what that email is concerning?
MS. CRONIN: Objection to form.
MR. AGLIANO: Same.
THE WITNESS: Are you talking about the September 6, 2012, email at 12:45 p.m.?
MR. WERSANT: Yes.
THE WITNESS: I'll just read it. "Please also advise if Old Republic will pay the outstanding taxes on the property--these are due, and if these are foreclosed, then there will be no property to defend title to."
BY MR. WERSANT:
Q   Was Old Republic aware that the property taxes were coming due on the property at this time?
MS. CRONIN: Objection to form.
THE WITNESS: I don't know.
BY MR. WERSANT:
Q   And the email about that from Elizabeth McGinnity, is that Old Republic's position on the payment of the taxes?
MS. CRONIN: Objection to form.
THE WITNESS: The exception is in the policy



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
216–219

1    that any matters attaching or created subsequent to
2    date of policy, so that would be anything, including
3    taxes, after the date of the policy.
4  BY MR. WERSANT:
5      Q    How about if there were taxes due before the
6  date of the policy?
7          MS. CRONIN:  Objection to form.
8          THE WITNESS:  It would depend on what the
9      exception says.
10  BY MR. WERSANT:
11      Q    All right.  Well, how does that language
12  interact with the prior language I questioned you about
13  actions that the lender can take that are reasonably
14  necessary to protect its lien?
15      A    I don't understand the question.
16          MS. CRONIN:  Objection.
17          MR. AGLIANO:  Same.
18  BY MR. WERSANT:
19      Q    Would you agree the payment of the taxes could
20  be an event that's reasonably necessary for the lender
21  to protect their lien and also a payment of taxes is
22  provided for under the mortgage?
23          MS. CRONIN:  Objection to form.
24          MR. AGLIANO:  Same.
25          THE WITNESS:  I generally would agree with

1    that.
2  BY MR. WERSANT:
3      Q    Do you understand -- do you have any
4  understanding how tax foreclosures are done in the state
5  of Florida, Mr. Partin?
6          MS. CRONIN:  Form.
7          THE WITNESS:  Not specifically.
8  BY MR. WERSANT:
9      Q    Well, would you agree with the general premise
10  that basically if somebody buys the tax certificate and
11  forecloses the property, they foreclose all their
12  interests out on the property?
13          MS. CRONIN:  Objection to form.
14          MR. AGLIANO:  Same.
15          THE WITNESS:  Well, there's a redemption
16      period, but generally speaking a tax lien would have
17      priority over a mortgage.
18  BY MR. WERSANT:
19      Q    So a tax lien could extinguish a mortgage?
20          MS. CRONIN:  Objection to form.
21          THE WITNESS:  Generally speaking, yes.
22  BY MR. WERSANT:
23      Q    Could a tax lien also extinguish the owner's
24  interest in the property as well?
25          MS. CRONIN:  Objection to form.

1          MR. AGLIANO:  Same.
2          THE WITNESS:  His interest could be foreclosed
3      out.
4  BY MR. WERSANT:
5      Q    If these taxes had not been paid and there had
6  been a tax foreclosure, would there have been any title
7  of HJH's left for Old Republic to defend?
8          MS. CRONIN:  Objection to form.
9          MR. AGLIANO:  Same.
10  BY MR. WERSANT:
11      Q    And assuming --
12      A    Well, Old Republic might have denied the claim
13  at that point and said you have no further interest in
14  the property because you did not pay the taxes, and this
15  was a matter created, suffered, assumed agreed to by
16  you.  We were not obligated to pay the taxes.  The
17  policy contained a tax exception for any years
18  subsequent to the year 2004, so the taxes are not
19  covered, and you allowed a noncovered event to foreclose
20  your title out.
21      Q    So, basically, if HJH had been foreclosed out
22  by the taxes, then Old Republic may have withdrawn the
23  funding for this quiet title lawsuit?
24          MS. CRONIN:  Objection to form.
25          MR. AGLIANO:  Same.

1          THE WITNESS:  It may have under the policy.
2  BY MR. WERSANT:
3      Q    You said it may have.  Are there -- could
4  there have been some other result?
5          MS. CRONIN:  Objection to form.
6          MR. AGLIANO:  Same.
7          THE WITNESS:  Well, the tax payment is not Old
8      Republic's responsibility, so the other result would
9      be for the owner or the lender to pay the taxes to
10      avoid the tax sale.
11  BY MR. WERSANT:
12      Q    And you would expect a lender would pay the
13  taxes in settling their lien yet foreclosed out?
14          MS. CRONIN:  Objection to form.
15          THE WITNESS:  That's the practice most lenders
16      do.  Most lenders keep an escrow for taxes, and even
17      if they don't keep an escrow, they understand that
18      if they don't pay the taxes, it will be foreclosed.
19  BY MR. WERSANT:
20      Q    If the property was foreclosed out in a tax
21  foreclosure, would there be an owner's policy or a loan
22  policy still in effect --
23          MS. CRONIN:  Objection to form.
24          MR. AGLIANO:  Same.
25  BY MR. WERSANT:

JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
220–223

Page 220

1    Q    -- such as these policies?
2         MS. CRONIN:  Same objection.
3         THE WITNESS:  I don't know how to respond to
4    that other than to say that it would be our
5    position, in all likelihood, that the occurrence of
6    a tax sale created a divestiture of title and that
7    there is no longer any insurable interest.
8    BY MR. WERSANT:
9    Q    So, basically, if the lender's lien is
10   foreclosed out, the owner's title interest is foreclosed
11   out, there's nothing left for Old Republic to insure
12   over?
13        MS. CRONIN:  Objection to form.
14   BY MR. WERSANT:
15   Q    You called it a divestiture of title.
16        MS. CRONIN:  Objection to form.
17        THE WITNESS:  If --
18        MR. AGLIANO:  Same.
19        THE WITNESS:  If the divestiture is due to a
20   noncovered title issue.
21   BY MR. WERSANT:
22   Q    Were you also aware that Howard Marks
23   communicated with me, asking my client to pay those
24   taxes?
25        MS. CRONIN:  Objection to form.

Page 221

1         MR. WERSANT:  No, let me strike that.
2    BY MR. WERSANT:
3    Q    Was Old Republic aware that Howard Marks had
4    personally requested that Kahama VII, the current holder
5    of this loan, through me, pay $230,000 in outstanding
6    real estate taxes on this property?
7         MR. AGLIANO:  Object to form.
8         MS. CRONIN:  Join.
9         THE WITNESS:  I don't recall seeing anything
10   to that effect.
11   BY MR. WERSANT:
12   Q    Well, was Marks' action in doing that part
13   of -- was it something that Old Republic retained him to
14   do?
15        MR. AGLIANO:  Form.
16        MS. CRONIN:  Objection to form.
17        THE WITNESS:  That would not be my
18   understanding.  He is retained to cure title.
19   BY MR. WERSANT:
20   Q    By Old Republic?  And if he does anything more
21   than that, he is not authorized by Old Republic to do
22   that?
23        MR. AGLIANO:  Form.
24        MS. CRONIN:  Same.
25        THE WITNESS:  I don't know that I would say

Page 222

1    "authorized."  We did not -- we would not be
2    involved in that.
3    BY MR. WERSANT:
4    Q    Okay.  Let me -- I guess let me ask you this,
5    Mr. Partin:  If you have outside counsel submit an
6    invoice for something, such as this, contacting someone
7    else to pay the taxes, and he billed Old Republic for
8    it, would you pay him?
9         MS. CRONIN:  Objection to form.
10        MR. AGLIANO:  Form.
11   BY MR. WERSANT:
12   Q    Would you pay him for doing work that was not
13   part of the quiet title case?
14        MS. CRONIN:  Same objection.
15        MR. AGLIANO:  Form.
16        THE WITNESS:  Not knowingly, no.
17   BY MR. WERSANT:
18   Q    To your knowledge, did Howard Marks bill Old
19   Republic for contacting Kahama VII to pay those taxes?
20        MS. CRONIN:  Objection to form.
21        MR. WERSANT:  Sorry, Kahama VI.
22        MR. AGLIANO:  Same.
23        MS. CRONIN:  Objection to form and --
24        MR. AGLIANO:  Privilege.  To the extent it
25   calls -- no, I'm objecting to the form, too.  But, I

Page 223

1    mean, to the extent it calls for attorney-client or
2    common interest work product privilege, we would
3    object and respectfully request Ms. Cronin to
4    instruct her client not to answer.
5         MS. CRONIN:  Would you read the question back?
6    Because what I might do is just let him answer it.
7    If --
8         MR. AGLIANO:  I think the question relates to
9    did they pay Marks to write this email or letter or
10   whatever Paul is talking about.
11   BY MR. WERSANT:
12   Q    Did Old Republic authorize Howard Marks and
13   pay him to contact Kahama VI to pay the real estate
14   taxes on the property?
15        MS. CRONIN:  Object to the form.
16        MR. AGLIANO:  I'll object to the form, and
17   I'll also state my privilege objection.
18        THE WITNESS:  Not to my knowledge.  It would
19   not be within the scope of his employment by Old
20   Republic.
21   BY MR. WERSANT:
22   Q    Is Old Republic aware of any alleged
23   arrangement by HJH and Kahama's predecessor-in-interest,
24   Landmark Equity Fund, to split any loss proceeds in the
25   event that the quiet title case was lost?



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
224–227

Page 224

1    MS. CRONIN:  Objection to form.
2    MR. AGLIANO:  Same.
3    THE WITNESS:  I'm sorry.  What?  Repeat the
4  question.
5  BY MR. WERSANT:
6    Q    Let me repeat that.  Was Old Republic aware of
7  any alleged arrangement between the borrower, HJH, and
8  Landmark Equity Fund, Kahama's predecessor-in-interest,
9  to split the loss proceeds of the owner's policy if HJH
10  lost the quiet title case?
11    MS. CRONIN:  Objection to form.
12    MR. AGLIANO:  Same.
13    THE WITNESS:  Not that I'm aware of at the
14  time.  I heard something to that effect at the
15  mediation, but not exactly in those terms.
16  BY MR. WERSANT:
17    Q    But you were not aware -- there was nothing in
18  the file to notate that?
19    A    No.  No.
20    Q    You've seen nothing in the file to notate
21  that?
22    A    No.
23    Q    And to your knowledge and understanding,
24  Elizabeth McGinnity did not know anything about that?
25    MS. CRONIN:  Objection to form.

Page 225

1    THE WITNESS:  Not that I've seen.
2  BY MR. WERSANT:
3    Q    And it would be your testimony that Old
4  Republic was not a part of any such agreement?
5    A    No.  And Old Republic intended to cure title
6  and not pay any loss.
7    Q    We went out on the break -- before lunch when
8  I was asking you about rates paid to attorneys, such as
9  those to Mr. Marks, and as I understood there was no
10  privilege being raised as to that question about his
11  rate of pay.
12        Have you had the opportunity to look at Old
13  Republic's records and find out at what rate Mr. Marks
14  was being paid to handle this case?
15    A    No, but --
16    MS. CRONIN:  You're asking me?
17    MR. WERSANT:  Well, I'm asking the witness.
18    THE WITNESS:  No.
19  BY MR. WERSANT:
20    Q    So you don't know how much he gets -- does he
21  get paid hourly?
22    A    Yes.
23    Q    Do you know how much he gets paid hourly?
24    A    No, but I think we agreed that we'd tell you
25  that.

Page 226

1    MS. CRONIN:  We'll give you that.  I didn't
2  realize you wanted it today.
3    THE WITNESS:  I can't access it unless I'm
4  back on my computer.
5    MR. WERSANT:  Well, you said you wanted to do
6  this today and complete it today, so I wanted to ask
7  him today about it.
8    MS. CRONIN:  Yeah.  Okay.  Well, you didn't --
9  I didn't get that from our conversation.
10    So, I guess, John, is that something you can
11  get ahold of pretty quick, what his rate was?
12    MR. AGLIANO:  I don't know about pretty quick.
13  I don't know.  He's in trial, and I wouldn't know
14  where to start.  I have to go to accounting -- are
15  we on the record or off?  We're on the record.
16    Well, I have to say I'd have to go through
17  accounting.  It's 4 o'clock.  I really wouldn't know
18  where to start.  I don't think I can get it within
19  the hour.
20    MR. WERSANT:  How about calling Jessica Hew?
21    MR. AGLIANO:  She's in trial.
22    MS. CRONIN:  She's in trial with Howard.
23    MR. AGLIANO:  They're trying a case together.
24    MR. WERSANT:  You don't know whether the
25  billing department -- whether they can access these

Page 227

1  records?
2    MR. AGLIANO:  They probably do, but by the
3  time I can track somebody to do that -- I will try,
4  and if I can get it, I will.  I'll email somebody
5  now during the break.
6  BY MR. WERSANT:
7    Q    Let me ask you this, Mr. Partin:  Do you know
8  the total amount that Howard Marks and Burr & Forman
9  billed for the prosecution of this case?
10    MR. AGLIANO:  Objection to form.
11    THE WITNESS:  No, because there had been -- I
12  know the approximate amount spent for attorney fees,
13  but there have been three attorneys in this case, so
14  that's not all paid to Burr & Forman.
15  BY MR. WERSANT:
16    Q    What do you mean by three attorneys?  You mean
17  outside -- you mean, the other outside --
18    A    Three counsels that we paid in this file.
19    Q    So you don't have any way to separate the
20  numbers, how much is paid just to the litigation
21  attorneys at Graham Builder and Burr & Forman?
22    A    Yes, I just don't -- I know the approximate
23  amount of the total attorneys fees.  I don't know, off
24  the top of my head, what was paid to Burr & Forman.
25    Q    Would Burr & Forman's fees be the bulk of that

JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
228–231

Page 228

1 number?
2    A    The majority of it, yes.
3    Q    Would you say about 90 percent?
4    A    I have no idea.
5    Q    What's the number?
6    A    Total amount?
7        MR. AGLIANO:  Form.
8        MR. WERSANT:  Yes.
9        THE WITNESS:  I don't know.  I don't know what
10   the costs were.  It's all one total number that I'm
11   looking at.  So there are costs; there are the other
12   attorneys.  I just have to look at it.
13 BY MR. WERSANT:
14   Q    Well, what's the -- well, you said you had a
15   number in mind; right?
16   A    I said I have the total number in mind.  I
17 don't -- I haven't broken it down by different law
18 firms.
19   Q    How hard would it be for you to do that?
20   A    It won't take me long once I get into the
21 computer program tomorrow.
22   Q    There is no way you can do it today?
23   A    No.
24   Q    What's the total amount that Old Republic has
25 spent on this case, including all the attorneys,

Page 229

1 Mr. Partin?
2        MS. CRONIN:  Objection to form.
3        MR. AGLIANO:  Same.
4        MS. CRONIN:  I mean, are you referring to this
5    case.
6        MR. WERSANT:  Well, I want to know how much
7    Old Republic has spent prosecuting this title claim,
8    period.
9        MS. CRONIN:  The quiet title case?
10       MR. WERSANT:  Well, he's saying he can't
11   separate the three firms they have hired out.
12       THE WITNESS:  Yes, I can.
13 BY MR. WERSANT:
14   Q    I'm sorry?
15   A    Yes, I can.
16   Q    You can't do it today, though?
17   A    I can't do it today.
18   Q    And I'm just asking about the total amount for
19 all three firms.
20       MS. CRONIN:  I'll object to form.
21       You can answer if you can.
22       THE WITNESS:  It's probably a little north of
23   750,000.
24 BY MR. WERSANT:
25   Q    750,000?

Page 230

1    A    Uh-huh.
2    Q    Would you say the bulk of that money -- at
3 least 90 percent of that money has been paid to Burr &
4 Forman?
5    A    I don't know.  I'll have to look at it.
6        MR. AGLIANO:  Objection to form.
7        THE WITNESS:  It's substantial.
8 BY MR. WERSANT:
9    Q    Would it be at least 500,000 of that money?
10       MS. CRONIN:  Objection to form.
11       MR. AGLIANO:  Same.
12 BY MR. WERSANT:
13   Q    Would you say it's at least $500,000?
14       MS. CRONIN:  Same objection.
15       THE WITNESS:  I don't know.  I just -- I
16   prefer to be specific, as you've probably noticed
17   today.
18 BY MR. WERSANT:
19   Q    Well, I appreciate that.  We were talking
20 before -- actually, let me show you what's going to be
21 marked as --
22       MR. WERSANT:  What are we on now?
23       THE REPORTER:  24.
24       (Exhibit Number 24 was marked for
25   identification.)

Page 231

1        MR. WERSANT:  This is Old Republic 521, and
2 for purposes of our case here, it's --
3        MS. CRONIN:  Is this going to be marked?
4        MR. WERSANT:  It will be, whatever exhibit is
5 coming up next here.
6        MR. AGLIANO:  24?
7        MS. CRONIN:  Right.
8        MR. WERSANT:  I believe this would be
9 Exhibit 27 of the third amended complaint.
10       MS. CRONIN:  It's not marked as such.
11 BY MR. WERSANT:
12   Q    Mr. Partin, can you identify that document for
13 the record?
14   A    This appears to be an email string ending in
15 an email from you to Ms. McGinnity dated November 19,
16 2012.
17   Q    Look at those first two sentences there.  Now,
18 that references an earlier email from Ms. McGinnity --
19 dated 9/6/2012 from Ms. McGinnity.
20       In fact, let me back up here.  I'm actually
21 going to show you that letter again, too.  I'll refer to
22 the last sentence of the third paragraph on page 2 of
23 Exhibit 22.  It talks about Old Republic evaluating its
24 obligations under the lender's and owner's policies as
25 to the payment of loss proceeds.



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
232–235

Page 232

1    A    Where?
2        MS. CRONIN:  May I point it to him?
3        MR. WERSANT:  Yeah, go ahead.
4        MS. CRONIN:  It's right here (indicating).
5        THE WITNESS:  Okay.
6   BY MR. WERSANT:
7    Q    You testified before in the owner's
8   policy that there is a clause that provides if the
9   borrower does not -- whether the borrower agrees to it
10  or not, the loss proceeds would go to the lender;
11  correct?
12       MS. CRONIN:  Objection to form.
13       MR. AGLIANO:  Same.
14       THE WITNESS:  I testified as to the provision
15      in the policy in the policy -- in the owner's policy
16      that the title insurer could pay the lender and
17      deduct that amount from the policy of the borrower.
18  BY MR. WERSANT:
19   Q    Right.  In this letter you have Ms. McGinnity
20  saying we have to evaluate our obligations under the
21  respective policies.  So why would there be any need to
22  evaluate your obligations if somebody is asking where
23  would the loss proceeds be paid to?
24       MS. CRONIN:  Objection to form.
25       MR. AGLIANO:  Same.

Page 233

1   BY MR. WERSANT:
2    Q    Didn't you testify that's already clear as to
3   where those loss proceeds would be paid?
4        MS. CRONIN:  Objection to form.
5        MR. AGLIANO:  Same.
6        THE WITNESS:  I don't know what she's speaking
7   to here.  Just, generally, first, she says, "In the
8       event that there's a loss, no policy payment would
9       be made before -- by or to you before it assessed
10      its respective obligations under both the owner's
11      and lender's policies."
12       I can't -- I don't know what specific issue
13      she's referring to, but, generally, I would say
14      she's just pointing out to you that no loss payment
15      would be made without further review.
16       MR. WERSANT:  Further review.  All right.
17      Well, I'm going -- what exhibit are we on now?
18       THE REPORTER:  We're at 25.
19       MR. WERSANT:  This is ORT 502.
20       MS. CRONIN:  Well, it's ORT 502, 503, 504.
21       MR. WERSANT:  It's a succession of pages.
22       MS. CRONIN:  505 is missing, and 506 appears
23      to be a different email.  There's some other
24      documents attached to it, but it is what it is.
25       That's 25?

Page 234

1        THE REPORTER:  Yes.
2        MS. CRONIN:  502, 503, 504, and the next page
3   is 506.  It appears to be page 2 of another email.
4        MR. WERSANT:  I can print -- you know what?
5   I'd actually like to show him that also, 505.
6        MS. CRONIN:  So it goes 506 -- excuse me.  It
7   looks like 505 is missing and 506 begins the second
8   page of presumably whatever -- you know, presumably
9   whatever 505 is.  Now marked as 25.
10       Do you want to see it?
11       MR. AGLIANO:  Yes, real quick.
12       MR. WERSANT:  You know what?  I wanted to
13  get -- where does that start, again?
14       MS. CRONIN:  It's 502, 3, and 4, and it goes
15  505, and it goes 506 through 520.
16       MR. WERSANT:  Could you print out a copy of
17  502 through 520?
18       MS. CRONIN:  Don't we just need 505?  Is that
19  what we need?  I can't really actually do that from
20  here.
21       MR. WERSANT:  Yeah, I guess 505 would be good.
22       MS. CRONIN:  I can't send to a printer from
23  here.  Are you online?
24       MR. WERSANT:  Well, I'm not online, because I
25  wasn't -- I didn't have your key for your guest

Page 235

1   access.
2        MS. CRONIN:  It's right on that thing there.
3   I'd rather not make it a part of the transcript,
4   though.
5        Go off for a second.
6        (Discussion off the record.)
7        (Exhibit Number 25 was marked for
8   identification.)
9        MR. WERSANT:  So, for the record, Exhibit 25
10  is going to be pages 495 to 520.
11       MS. CRONIN:  May I see it again?  These are
12  all separate documents, but -- I mean, you can put
13  them all together if you want.
14       MR. WERSANT:  Well, they all relate to the --
15       MS. CRONIN:  Well, I'm just saying they're
16  not -- I don't want them characterized as a single
17  document, because it's not a single document.
18       MR. WERSANT:  Right.
19       MS. CRONIN:  They are several different
20  printouts of emails in different order, and -- I
21  mean, you mark them however you want.  They are your
22  exhibits.  But...
23  BY MR. WERSANT:
24   Q    All right.  Let me show you what's been marked
25  as Exhibit 25.  Mr. Partin, have you seen this



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
236–239

Page 236

1  document -- actually, these series of documents before?
2     A    Are these supposed to be multiple copies of
3  the same thing?
4     Q    These are what were produced to me.  So...
5     A    They are multiple copies, but I've seen these
6  documents, yes.
7     Q    So what do these documents relate to?
8         MS. CRONIN:  Objection to form.
9         MR. AGLIANO:  Join.
10        THE WITNESS:  Generally, they relate to the
11   mediated agreement -- the mediation in -- it's a
12   mediation session held on October 16, 2012.
13  BY MR. WERSANT:
14    Q    It was between HJH and the City of New Smyrna
15  in the quiet title case?
16    A    Yes.
17    Q    And under the settlement agreement -- let me
18  have that back for just a moment.  Was it your
19  understanding under this agreement that HJH would
20  agree -- was agreeing to a restriction on the property,
21  limiting it to eight condominium units instead of 14?
22        MS. CRONIN:  Objection to form.
23        MR. AGLIANO:  Same.
24        THE WITNESS:  As part of the settlement
25    agreement, I believe that the city and HJH agreed

Page 237

1    that there will be a limit of eight condo units
2    approved by the city, conditioned on other
3    approvals.
4  BY MR. WERSANT:
5     Q    It was also your understanding that HJH
6  through Burr & Forman would receive $100,000 under this
7  agreement --
8         MS. CRONIN:  Objection to form.
9         MR. AGLIANO:  Same.
10  BY MR. WERSANT:
11    Q    -- from the city or the Florida Municipal
12  Insurance Trust?
13        MS. CRONIN:  Objection to form.
14        MR. AGLIANO:  Same.
15        THE WITNESS:  Yes, I believe there was a
16    payment to HJH of 100,000 by the insurance carrier
17    for the city.
18  BY MR. WERSANT:
19    Q    And you also understand that the parties were
20  going -- the city and HJH were going to execute a
21  covenant running with the land on the disputed property
22  referenced in the complaint prohibiting any construction
23  on the disputed property, as defined in the complaint --
24        MS. CRONIN:  Objection to form.
25        MR. AGLIANO:  Same.

Page 238

1  BY MR. WERSANT:
2     Q    -- except for beach dune walkovers or other
3  structures that may become permissible by applicable law
4  and allowing the development of no more than eight
5  units.
6         MR. AGLIANO:  Same.
7         MS. CRONIN:  Objection.
8  BY MR. WERSANT:
9     Q    Was it your understanding that was a condition
10  of this agreement as well?
11        MR. AGLIANO:  Same.  Form.
12        MS. CRONIN:  Objection to form.
13        THE WITNESS:  The document speaks for itself.
14    But, generally, yes, they agreed to eight condos and
15    an easement over the 150 feet disputed section.
16  BY MR. WERSANT:
17    Q    Well, wasn't that agreement contrary to the
18  quiet title case HJH had filed in 2008 to quiet the
19  title?  Is that part of the property?
20        MS. CRONIN:  Objection to form.
21        MR. AGLIANO:  Same.
22        THE WITNESS:  I wasn't a part of that
23    agreement.  I don't -- you know, the agreement did
24    confirm fee title to the 150-foot strip in HJH by
25    the city.

Page 239

1  BY MR. WERSANT:
2     Q    Subject to this covenant?
3         MS. CRONIN:  Objection to form.
4         MR. AGLIANO:  Form.
5  BY MR. WERSANT:
6     Q    Would you agree, as a result of this
7  agreement, that HJH's title was now subject to the
8  covenant by the city?
9         MS. CRONIN:  Objection to form.
10        MR. AGLIANO:  Same.
11        THE WITNESS:  I don't know what to call it.
12    It was a restriction on the 150 feet, an easement --
13        MR. WERSANT:  Okay.
14        THE WITNESS:  -- a restriction of use.  I'm
15    not sure what to call it.
16  BY MR. WERSANT:
17    Q    I'll refer you also to ORNTIC 00503.
18  Paragraphs 1, 2, 3 and 4, is this a -- what is this --
19  what is this document here, Mr. Partin?
20        MS. CRONIN:  I object to the form.  Again,
21    note my objection to the inclusion of all these
22    document as though they were a single transmittal or
23    a single agreement.
24        MR. AGLIANO:  Same.  I'll join the objection.
25        THE WITNESS:  Okay.  This is a draft of a



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
240–243

Page 240

1    separate agreement that was not part of the
2    mediation itself.
3    BY MR. WERSANT:
4        Q    This was an agreement between HJH and Old
5    Republic, wasn't it?
6            MS. CRONIN: Objection to form.
7            MR. AGLIANO: Same.
8    BY MR. WERSANT:
9        Q    Well, I'm just referring to this document for
10   right now, this ORNTIC 503 and ORNTIC 505. I guess I'm
11   assuming ORNTIC 502 was the correspondence associated
12   with that.
13           Was this supposed to be a separate agreement
14   between Old Republic and HJH?
15           MS. CRONIN: Objection to form.
16           MR. AGLIANO: Same.
17           THE WITNESS: Yes, it was negotiated
18   separately.
19   BY MR. WERSANT:
20       Q    Who negotiated this agreement?
21       A    Liz McGinnity and -- sorry, I have to get his
22   name.
23       Q    Howard Marks?
24       A    No.
25           MS. CRONIN: Object --

Page 241

1    BY MR. WERSANT:
2        Q    He was an attorney for HJH?
3        A    Donaghy.
4        Q    Kevin Donaghy?
5        A    Yes.
6        Q    What were the terms of this agreement, this
7    proposed agreement?
8            MS. CRONIN: Objection to form.
9            MR. AGLIANO: Same.
10           THE WITNESS: Generally, it was a settlement
11   of the claim between -- from HJH on the title policy
12   upon payment of the sum of $100,000 by Old Republic
13   to HJH.
14   BY MR. WERSANT:
15       Q    So that was another $100,000 in addition to
16   the one -- the settlement they had with the city; right?
17           MS. CRONIN: Objection to form.
18           MR. AGLIANO: Same.
19           THE WITNESS: It's my understanding the city
20   paid them 100,000, and they also submitted damages
21   to Liz McGinnity for expenses, cost of their own
22   attorneys, such things as that.
23   BY MR. WERSANT:
24       Q    What do you mean "for their own attorneys"?
25       A    I don't know. It was for just -- it was a

Page 242

1    lump sum for amounts that they claimed as expenses
2    throughout this process. There was no specific number
3    for the separate items. It was just --
4        Q    It was just a lump sum?
5        A    Generally, a lump sum that they demanded to
6    enter into the settlement agreement with the city.
7        Q    And they also -- and under this agreement, HJH
8    was going to release all claims against Old Republic
9    under the owner's policy?
10           MS. CRONIN: Object to form.
11   BY MR. WERSANT:
12       Q    Go ahead.
13           MS. CRONIN: Same objection.
14   BY MR. WERSANT:
15       Q    Go ahead.
16       A    They were going to release this claim.
17       Q    This title claim to Old Republic?
18       A    Yes.
19       Q    Would Old Republic then continue to prosecute
20   the quiet title case --
21           MS. CRONIN: Objection.
22   BY MR. WERSANT:
23       Q    -- against the county?
24           MS. CRONIN: Objection to form.
25           THE WITNESS: That was our intent and that was

Page 243

1    what we did. And part of the consideration for that
2    was to keep HJH involved in the litigation so they
3    wouldn't just walk away from the litigation.
4    BY MR. WERSANT:
5        Q    And the fourth paragraph on this draft says
6    HJH was going to assign to Old Republic all claims it
7    has against Strategica Realty, LLC, in Case Number
8    2011-20199. Are you familiar with that case,
9    Mr. Partin?
10       A    I believe that's the case by HJH on the
11   warranty deed that Strategica gave HJH.
12           (Exhibit Number 26 was marked for
13   identification.)
14   BY MR. WERSANT:
15       Q    This is ORNTIC 1577, and this is the complaint
16   filed by HJH against Strategica Realty dated March 22nd,
17   2011. Have you seen this document before, Mr. Partin?
18       A    No.
19       Q    Well, but you know of -- knew of the lawsuit,
20   though; correct?
21       A    I knew there's a lawsuit.
22       Q    Or Old Republic knew of it?
23       A    I knew there was a lawsuit filed, yes.
24       Q    Did Old Republic -- did Old Republic retain
25   Howard Marks to prosecute this lawsuit against



Page 244

1 Strategica Realty?
2    A    It was part of his engagement, yes.
3    Q    So Old Republic has paid Howard Marks to
4 prosecute this lawsuit?
5    A    As far as I know, yes.
6    Q    Did you have any explanation why there's been
7 no activity in this lawsuit since 2011?
8        MS. CRONIN:  Objection to form.
9        MR. AGLIANO:  Same.
10       THE WITNESS:  Not specifically, other than I
11   heard it mentioned that Strategica was a
12   single-property entity and may not have any assets.
13 BY MR. WERSANT:
14   Q    Who mentioned that to you?
15   A    I just saw it in something or someone
16 mentioned it to me.
17   Q    Well, if they had no assets, why let this
18 lawsuit sit here?
19       MS. CRONIN:  Objection to form.
20       MR. AGLIANO:  Same.
21       THE WITNESS:  We don't know that for a fact.
22 BY MR. WERSANT:
23   Q    We don't know what for a fact?
24   A    That it is a special entity with no assets.
25   Q    Well, I guess my point is, this lawsuit --

Page 245

1 correct me if I'm wrong, you hired Howard Marks -- you
2 testified you hired Howard Marks to prosecute this quiet
3 title case against the city and the county to quiet the
4 title to resolve the title issues.  This lawsuit doesn't
5 mention anything about resolving title issues; it's just
6 asking for damages.
7        MR. AGLIANO:  Form.
8 BY MR. WERSANT:
9    Q    So why is Old Republic hiring Howard Marks to
10 sue Strategica Realty for damages?
11       MS. CRONIN:  Form.
12       MR. AGLIANO:  Join.
13       THE WITNESS:  To see if there is anything to
14   recover, to seek recovery against the seller.
15 BY MR. WERSANT:
16   Q    So would this be like -- this would be like a
17 subrogation claim?
18       MS. CRONIN:  Objection.
19       THE WITNESS:  Yes.
20       MR. AGLIANO:  Form.
21 BY MR. WERSANT:
22   Q    So, basically, the title company was
23 exercising its subrogation rights by filing this
24 lawsuit?
25   A    Well, at that point in time it was filed by

Page 246

1 HJH because we didn't have standing.  We had not had a
2 loss.  So it was filed in the name of HJH and --
3    Q    If HJH gets recovery out of this case, who
4 gets that recovery?
5        MS. CRONIN:  Objection to form.
6        MR. AGLIANO:  Same.
7        THE WITNESS:  We would be subrogated to the
8    rights of HJH.  Whether we get that money or claim
9    that money is our option.
10 BY MR. WERSANT:
11   Q    So per this Exhibit 25 that we just discussed,
12 did HJH in fact assign these claims to Old Republic --
13       MS. CRONIN:  Objection to form.
14       MR. AGLIANO:  Form.
15 BY MR. WERSANT:
16   Q    -- in this case?
17       MS. CRONIN:  Same objection.
18       MR. AGLIANO:  And that's Exhibit 26?
19 BY MR. WERSANT:
20   Q    Go ahead.
21   A    I believe that was part of the transaction,
22 the settlement.  I haven't seen a signed settlement
23 agreement.
24   Q    And it's your understanding that this case
25 hasn't been prosecuted because the plaintiff doesn't --

Page 247

1 HJH doesn't think Strategica has assets to collect
2 against?
3        MS. CRONIN:  Objection to form.
4        MR. AGLIANO:  Same.
5        THE WITNESS:  Generally speaking, without
6    being involved in it, it was filed to preserve the
7    rights of HJH, and then Old Republic, as potential
8    subrogee, really probably could not proceed because
9    there was no damages determined at that point in
10   time.
11 BY MR. WERSANT:
12   Q    When you say "at that time," would you need to
13 have -- would there need to be some determination in the
14 quiet title case as to title before you could pursue
15 Strategica on this case?
16       MS. CRONIN:  Objection to form.
17       MR. AGLIANO:  Same.
18       THE WITNESS:  It was basically to preserve our
19   rights in the event of loss and reserve HJH's rights
20   in the event of loss.
21 BY MR. WERSANT:
22   Q    Has Old Republic been agreeable to this case
23 essentially remaining on hold since 2011 in this status?
24       MS. CRONIN:  Objection to form.
25       MR. AGLIANO:  Form.



Page 248

1    MS. CRONIN:  And I think I'm going to assert a
2  work product objection on that, too.  This is an
3  ongoing litigation in both cases.
4    MR. AGLIANO:  I'll join the objection.
5    MR. WERSANT:  Let me clarify something.  I've
6  also shown this witness an assignment of contracts
7  from my client, obtained an assignment of all
8  contracts, including this one from HJH.  So we
9  actually claim the interest in this litigation as
10  well whether we foreclose or not.
11    MS. CRONIN:  Are you talking to him or are you
12  talking to me?
13    MR. WERSANT:  I'm talking to both of you.  My
14  client has a secured interest in this lawsuit and
15  these claims, too.
16    MS. CRONIN:  That's your position.
17    THE WITNESS:  I don't dispute that.
18    MR. WERSANT:  You're not disputing that?
19    MS. CRONIN:  No, wait a minute.  You're not
20  disputing -- clarify your answer, please.
21    THE WITNESS:  You have a claim to that against
22  Strategica, a potential claim.
23    MR. WERSANT:  Right.  Yes.
24  BY MR. WERSANT:
25    Q    So my point is this:  I'm simply asking, has

Page 249

1  Old Republic been agreeable to this case to essentially
2  remaining on hold for the last three years?
3    MS. CRONIN:  I'm again going to object to
4  form.
5    MR. AGLIANO:  Object to form.
6    MS. CRONIN:  I'm going to object based on work
7  product in that ongoing litigation and in the
8  underlying quiet title litigation.  I instruct the
9  witness not to answer to preserve work product.
10    MR. AGLIANO:  I join in the objections.
11    MR. WERSANT:  Would the communications
12  regarding this -- I guess, were these communications
13  identified in Marks' privilege log regarding this
14  case, John.
15    MR. AGLIANO:  I don't know.  Marks' privilege
16  log speaks for itself, and neither Beth, nor I, are
17  the witnesses today, Paul.  It's your deposition.
18  You are running out of time.
19  BY MR. WERSANT:
20    Q    All right.  Well, and I guess the other
21  question is, Mr. Partin, you -- Old Republic was aware
22  of the fact that under that mortgage and the other
23  security documents that the lender required the borrower
24  the consent -- or the borrower to obtain approval for
25  effecting title on the property; correct?

Page 250

1    MS. CRONIN:  Objection to form.
2    MR. AGLIANO:  Join.
3    THE WITNESS:  No, I don't think we did.
4  BY MR. WERSANT:
5    Q    You didn't have that understanding?
6    MS. CRONIN:  Objection to form.
7  BY MR. WERSANT:
8    Q    To your knowledge, why wasn't -- why wasn't --
9  Elizabeth McGinnity says in an email in September that
10  Old Republic is going to evaluate their obligations
11  under the policy regarding the loss proceeds and then --
12  so why is it a month before the settlement, she's saying
13  that, but then the settlement was conducted without my
14  client's knowledge or consent regarding these
15  proceedings?  Do you have any explanation for that?
16    MS. CRONIN:  Objection to form.
17    MR. AGLIANO:  Same.
18  BY MR. WERSANT:
19    Q    Why wasn't the lender made a part of the
20  settlement?
21    MS. CRONIN:  Are you going to let him answer a
22  question or are you rephrasing your question?
23    MR. WERSANT:  I'll rephrase it.
24  BY MR. WERSANT:
25    Q    Why wasn't the lender's consent obtained for

Page 251

1  this settlement?
2    MS. CRONIN:  Objection to form.
3    MR. AGLIANO:  Same.
4  BY MR. WERSANT:
5    Q    Go ahead.
6    A    It was pending litigation and HJH wanted to
7  settle it, and they agreed to settle it.
8    Q    But you were also agreeing as part of the
9  settlement to write off the proceeds of the insurance
10  policy, weren't you?
11    MS. CRONIN:  Objection to form.
12    THE WITNESS:  Could you repeat the question?
13  BY MR. WERSANT:
14    Q    You were agreeing as part of the settlement to
15  basically write off the owner's policy; correct?
16    MS. CRONIN:  Objection to form.
17    MR. AGLIANO:  Same.
18    THE WITNESS:  Write off?  I don't understand
19  what "write off" is.
20  BY MR. WERSANT:
21    Q    Let me put it this way:  You would pay HJH
22  $100,000, and in exchange for that 100,000, Old Republic
23  would have no further obligation to pay any loss
24  proceeds under this policy; correct?
25    MS. CRONIN:  Objection to form.



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
252—255

Page 252

1    MR. AGLIANO:  Same.
2    THE WITNESS:  To HJH, that is correct.
3  BY MR. WERSANT:
4    Q    There would be nothing under this $1.7 million
5  owner's policy left to pay them after this settlement;
6  correct?
7    MS. CRONIN:  Objection to form.
8    MR. AGLIANO:  Same.
9    THE WITNESS:  Not on this claim.
10  BY MR. WERSANT:
11    Q    All right.  Would that be the elimination of
12  any loss proceeds under the policy as to other claims?
13    MS. CRONIN:  Objection to form.
14    MR. AGLIANO:  Same.
15    THE WITNESS:  Probably not.
16  BY MR. WERSANT:
17    Q    So there would be nothing left -- there would
18  be no loss proceeds left payable under this policy,
19  period?
20    MS. CRONIN:  Objection to form.
21    THE WITNESS:  I didn't say that.
22  BY MR. WERSANT:
23    Q    You would just say as to this claim, there
24  would be no further payouts for losses --
25    THE WITNESS:  Would you read back his first

Page 253

1  question, please?
2    MR. WERSANT:  Yes.
3    (The requested portion of the record was read
4  by the reporter as follows:
5    "Question:  So there would be nothing left --
6  there would be no loss proceeds left payable under
7  this policy, period?")
8    MS. CRONIN:  I'll restate my objection to the
9  form.
10    MR. AGLIANO:  Join.
11    MS. CRONIN:  Do you understand where we are?
12    THE WITNESS:  Yes.
13    MS. CRONIN:  Okay.
14    MR. WERSANT:  Do you want me to repeat the
15  question?
16    THE WITNESS:  Yes.
17  BY MR. WERSANT:
18    Q    All right.  If Old Republic executed the
19  agreement with HJH, this Exhibit 25 I've just handed to
20  you, there would be a total settlement of the loss
21  proceeds under the owner's policy as to this title
22  claim, this quiet title case; is that correct?
23    MS. CRONIN:  Objection to form.
24    MR. AGLIANO:  Same.
25    THE WITNESS:  No.

Page 254

1  BY MR. WERSANT:
2    Q    That would not be a total settlement of loss
3  proceeds?
4    A    No.
5    MR. AGLIANO:  Objection to form.
6  BY MR. WERSANT:
7    Q    Why wouldn't it be?
8    MS. CRONIN:  Same objection.
9    MR. AGLIANO:  Join.
10    THE WITNESS:  That amount was paid for
11  attorney fees and expenses.  That's a separate
12  payable under the policy.
13    MR. WERSANT:  All right.
14    THE WITNESS:  That does not reduce the
15  liability -- the loss, the policy amount.
16  BY MR. WERSANT:
17    Q    HJH's settlement with the City of New Smyrna,
18  the one resulting from this -- from this mediation
19  agreement on October 16th, did Old Republic approve that
20  settlement?
21    MS. CRONIN:  Objection to form.
22    MR. AGLIANO:  Same.
23    THE WITNESS:  No.
24  BY MR. WERSANT:
25    Q    Did Old Republic approve the imposition of the

Page 255

1  covenant, the easement across the property, by the city
2  in that agreement?
3    MS. CRONIN:  Objection to form.
4    MR. AGLIANO:  Join.
5    THE WITNESS:  No.
6  BY MR. WERSANT:
7    Q    Why didn't Old Republic approve that
8  settlement?
9    MS. CRONIN:  Objection to form.
10    MR. AGLIANO:  Join.
11    THE WITNESS:  We were not asked to.  That was
12  a mediation between HJH and the city.
13  BY MR. WERSANT:
14    Q    But Old Republic knew about the settlement?
15    MS. CRONIN:  Objection to form.
16    MR. AGLIANO:  Same.
17    THE WITNESS:  It did know about the mediation
18  and the proposed settlement, but that was between
19  HJH and the city.
20  BY MR. WERSANT:
21    Q    Did Howard Marks -- to your knowledge, did
22  Howard Marks bill Old Republic for the time that he
23  spent negotiating that settlement agreement with the
24  city?
25    MS. CRONIN:  Objection to form.



Page 256

1      MR. AGLIANO:  Same.
2      THE WITNESS:  I don't know.
3  BY MR. WERSANT:
4      Q    Would Old Republic's insurance policy with HJH
5  provide coverage -- would it insure over that
6  easement --
7      MS. CRONIN:  Objection.
8  BY MR. WERSANT:
9      Q    -- or would that be an exception to the
10  policy?
11      MR. AGLIANO:  Form.
12      MS. CRONIN:  Objection to form.
13      THE WITNESS:  I don't understand the question.
14  BY MR. WERSANT:
15      Q    Well, let me rephrase this a different way.
16  This easement is a restriction that HJH created with the
17  city over the property.  What effect would that have on
18  the owner's policy, this easement?
19      MS. CRONIN:  Objection to form.
20      MR. AGLIANO:  Same.
21      THE WITNESS:  Well, pursuant to the agreement
22  between Old Republic and HJH, it resolved their
23  claim --
24  BY MR. WERSANT:
25      Q    But would --

Page 257

1      A    -- on that easement or their claim for that
2  150-foot strip.
3      Q    But would this new easement become -- is it an
4  exclusion under the policy?
5      MS. CRONIN:  Objection to form.
6      MR. AGLIANO:  Same.
7      THE WITNESS:  It doesn't have to deal with the
8  policy.  The policy was already issued.
9  BY MR. WERSANT:
10      Q    Right.  So the policy would only deal with
11  events that existed at the time it was executed?
12      MS. CRONIN:  Objection to form.  Is that a
13  question?
14      MR. AGLIANO:  Same.
15      THE WITNESS:  They are insured as of the date
16  of the policy.
17  BY MR. WERSANT:
18      Q    Right.  And Old Republic had no duty or
19  obligation or responsibility on its part to inform the
20  lender of this settlement?
21      MS. CRONIN:  Objection to form.
22      MR. AGLIANO:  Same.
23      THE WITNESS:  It was a mediated settlement
24  between HJH and the city.  Our duty is to defend the
25  title, and I don't know of any duty that we had to

Page 258

1  disclose any settlement to anyone.
2  BY MR. WERSANT:
3      Q    Including the other policyholder?
4      MS. CRONIN:  Objection to form.
5      MR. AGLIANO:  Join.
6      THE WITNESS:  I don't know of any duty to
7  advise another insured of a settlement that one
8  insured reaches.
9      (Exhibit Number 27 was marked for
10  identification.)
11  BY MR. WERSANT:
12      Q    I'm going to show you Exhibit 27.  This is
13  ORNTIC 1584 through 1596.
14      MS. CRONIN:  Again, to the extent that you're
15  marking Exhibit 27 as a single document, it's a
16  composite of documents.
17  BY MR. WERSANT:
18      Q    Before we get to that, Mr. Partin, you would
19  also agree, though -- would you also agree that Old
20  Republic benefitted from this settlement?
21      MS. CRONIN:  Objection to form.
22      MR. AGLIANO:  Same.
23      THE WITNESS:  This settlement resolved a claim
24  by HJH.
25  BY MR. WERSANT:

Page 259

1      Q    And that would also mean that Old Republic
2  wouldn't have to litigate that claim anymore against the
3  city, would they?
4      MS. CRONIN:  Objection to form.
5      MR. AGLIANO:  Same.
6      THE WITNESS:  That is correct, we wouldn't
7  have to litigate with the city, but we still have
8  the ongoing litigation with the county.
9  BY MR. WERSANT:
10      Q    As to the dedication issue across the beach?
11      MS. CRONIN:  Objection to form.
12      MR. AGLIANO:  Same.
13      THE WITNESS:  As to the issues before the
14  court, the remaining action with the county.
15  BY MR. WERSANT:
16      Q    To your knowledge, did Old Republic through
17  its counsel ever try to resolve the title issues with
18  Volusia County?
19      MS. CRONIN:  Objection to form.
20      MR. AGLIANO:  Same.
21      THE WITNESS:  I'm not sure when it did, but
22  either -- I believe before the mediation, the county
23  was invited to attend and declined.  And there had
24  been some ongoing discussions since the mediation,
25  and the county in essence has said we're not going



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
260–263

Page 260

1   to object to the mediated settlement, but for
2   reasons of preserving the public interest, we're not
3   going to sign it either.
4   BY MR. WERSANT:
5       Q    Were you also aware that the county attorney
6   in November of 2012 had offered HJH a resolution to a
7   mutual dismissal of the lawsuit if they would just agree
8   to an agreed dedication on the property?
9           MS. CRONIN:  Objection to form.
10          MR. AGLIANO:  Same.
11          THE WITNESS:  I know there were discussions,
12      but I don't think there was any final offer.  Or the
13      terms of the offer weren't finalized.
14  BY MR. WERSANT:
15      Q    Would Old Republic have agreed to a dedication
16  being imposed on the property as a part of that
17  settlement, as to Volusia County?
18          MS. CRONIN:  Objection to form.
19          MR. AGLIANO:  Same.
20          THE WITNESS:  I don't know at this point in
21      time.  We would have to look at it.
22  BY MR. WERSANT:
23      Q    So if that was presented to Old Republic, they
24  wouldn't necessarily reject it?
25          MS. CRONIN:  Objection to form.

Page 261

1           MR. AGLIANO:  Same.
2           THE WITNESS:  We will review it.  We have not
3       reached an opinion on that.
4   BY MR. WERSANT:
5       Q    I'm showing you what's been marked as
6   Exhibit 27.  Have you seen this document before?
7           MS. CRONIN:  Objection to form.
8           THE WITNESS:  Well, this is actually four or
9       five different documents, but, yes, I've seen them
10      before.
11  BY MR. WERSANT:
12      Q    What is that document -- what does the series
13  of documents represent, Mr. Partin?
14          MS. CRONIN:  Objection to form.
15          THE WITNESS:  Generally speaking, it's a
16      release agreement between HJH given to Old Republic
17      National Title Insurance Company regarding the
18      pending claim.
19  BY MR. WERSANT:
20      Q    So this is a separate settlement agreement
21  than HJH's settlement with the city?
22          MS. CRONIN:  Objection to form.
23          MR. AGLIANO:  Same.
24          THE WITNESS:  It was separate from the city
25      agreement, yes.

Page 262

1   BY MR. WERSANT:
2       Q    But there was -- is this the same -- there was
3   a -- do you recall that draft agreement, the unsigned
4   one between HJH and Old Republic talking about an
5   assignment that Strategica claims?  Was that a draft
6   version of this executed agreement?
7           MS. CRONIN:  Objection to form.
8   BY MR. WERSANT:
9       Q    Do you know what I'm referring to?
10          MS. CRONIN:  Same objection.
11          THE WITNESS:  You mean --
12          MR. AGLIANO:  Join.
13          THE WITNESS:  You mean an assignment of
14      the --
15  BY MR. WERSANT:
16      Q    Let me take you to the one I'm referring to.
17  This is going to be -- I'm referring to ORNTIC
18  496 -- I'm sorry -- 503 through 504, this agreement.
19  This is the draft agreement from mid-November of 2016.
20          MS. CRONIN:  What's the question?
21  BY MR. WERSANT:
22      Q    Is this agreement -- this was -- was this the
23  precursor of this agreement?
24          MS. CRONIN:  Objection --
25  BY MR. WERSANT:

Page 263

1       Q    Is this an earlier version of this agreement?
2           MS. CRONIN:  Objection to form.
3           THE WITNESS:  This is the actual settlement
4       agreement between -- the agreement to settle, and
5       this is the release agreement from HJH of its claims
6       against Old Republic.
7   BY MR. WERSANT:
8       Q    Did Old Republic in this agreement -- this
9   ORNTIC 503 through 504, did Old Republic actually
10  execute this document?
11      A    I don't recall.
12      Q    You've never seen an executed version of this
13  document?
14      A    I don't recall.
15      Q    Is there anything -- and you don't recall
16  seeing any records in your file regarding this
17  agreement?
18      A    Yes, I have seen that agreement.  I just don't
19  recall if it was executed.
20      Q    This agreement -- you would agree under this
21  December agreement that Old Republic paid HJH $100,000?
22          MS. CRONIN:  Objection to form.
23          MR. AGLIANO:  Same.
24          THE WITNESS:  We paid $100,000 to their
25      attorney who was going to distribute it to various



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
264–267

Page 264

1    entities, pay expenses, including HJH.
2  BY MR. WERSANT:
3    Q    What else -- what else was Old Republic going
4  to do -- what else is going to be provided as part of
5  this agreement?  What was HJH going to -- let me
6  clarify.
7        In return for that $100,000, what was HJH
8  going to do?
9        MS. CRONIN:  Objection to form.
10        MR. AGLIANO:  Join.
11        THE WITNESS:  HJH agrees to cooperate in the
12    defense of the lawsuit in accordance with its
13    obligations under the policy.
14  BY MR. WERSANT:
15    Q    Was Old Republic obliged to do that?
16        MS. CRONIN:  Objection to form.
17        MR. AGLIANO:  Same.
18        THE WITNESS:  It might have been, but we
19    wanted to get their agreement so we would have
20    something that's enforceable without trying to
21    enforce the policy terms after we had settled with
22    them.
23  BY MR. WERSANT:
24    Q    Well, you wanted them to agree to -- you
25  wanted the second agreement that they were bound under

Page 265

1  the policy terms?
2        MS. CRONIN:  Objection to form.
3        MR. AGLIANO:  Same.
4        THE WITNESS:  We didn't want to have to pursue
5    them under the policy terms.  We wanted them to
6    execute a release and not have an argument that
7    after they settled this, they would have no further
8    obligations under the policy.
9  BY MR. WERSANT:
10    Q    Why would you need an additional agreement?
11  Why would you need an agreement in addition to the
12  policy on that?
13        MS. CRONIN:  Objection to form.
14        MR. AGLIANO:  Same.
15        THE WITNESS:  As I just explained, we did not
16    want them to make the argument that they were
17    released from the obligation of the policy by the
18    settlement.
19  BY MR. WERSANT:
20    Q    By the city settlement?
21        MS. CRONIN:  Objection to form.
22        MR. AGLIANO:  Same.
23        THE WITNESS:  No, by the settlement between
24    Old Republic and HJH.
25  BY MR. WERSANT:

Page 266

1    Q    Who proposed this?  Who proposed this
2  agreement?
3        MS. CRONIN:  Objection to form.
4        MR. AGLIANO:  Same.
5        THE WITNESS:  I believe it was Liz.
6  BY MR. WERSANT:
7    Q    Liz, the --
8    A    Liz McGinnity.
9    Q    Why did she propose this agreement?
10        MS. CRONIN:  Objection to form.
11        THE WITNESS:  Because we wanted to make sure
12    that they were obligated after this settlement to
13    continue cooperating in the suit and not have the
14    argument that they had been released from that
15    policy obligation.
16  BY MR. WERSANT:
17    Q    No, what I'm saying is why enter into this
18  agreement in the first place?  Why pay them the $100,000
19  in the first place?  You didn't have to.
20        MS. CRONIN:  Objection to form.
21        MR. AGLIANO:  Same.
22        THE WITNESS:  Because they were making it a
23    condition of their settlement at the mediation.
24  BY MR. WERSANT:
25    Q    The condition of what settlement?

Page 267

1        MS. CRONIN:  Objection to form.
2        THE WITNESS:  The mediation settlement between
3    HJH and the city.
4  BY MR. WERSANT:
5    Q    They were trying to make a -- so they were
6  trying to say they would only -- in order to do that
7  settlement, Old Republic would have to sign this
8  settlement?
9        MS. CRONIN:  Hold on a second.
10        MR. AGLIANO:  Objection to form.
11        MS. CRONIN:  Objection to form, but I'm not
12    sure if that's seeking work product and privileged
13    communication, too.
14        Can you repeat -- can you read me back the
15    question, please?
16        Or confidential mediation communications, for
17    that matter.
18        (The requested portion of the record was read
19    by the reporter as follows:
20        "Question:  They were trying to make a -- so
21    they were trying to say they would only -- in order
22    to do that settlement, Old Republic would have to
23    sign this settlement?")
24        MS. CRONIN:  I would just object to the form.
25        MR. AGLIANO:  Join.



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
268–271

Page 268

1    MR. WERSANT: Let me repeat that question or
2 rephrase it.
3 BY MR. WERSANT:
4    Q    Are you testifying that Old Republic would
5 only do the settlement with the city in October of 2012
6 if Old Republic signed this agreement with them in
7 December 2012?
8    MS. CRONIN: Objection to form.
9    MR. AGLIANO: Same.
10    THE WITNESS: No, Old Republic was not a part
11 of the mediation.
12 BY MR. WERSANT:
13    Q    Right. So what I'm trying to understand is,
14 Old Republic was not obliged to pay HJH anything. They
15 were not obliged to give them $100,000.
16    MS. CRONIN: Is that a question?
17 BY MR. WERSANT:
18    Q    Why did Old Republic enter into this agreement
19 to pay them the money in the first place?
20    MS. CRONIN: Objection to form.
21    MR. AGLIANO: Same.
22    THE WITNESS: They wanted their expenses
23 reimbursed if they were going to settle with the
24 city.
25 BY MR. WERSANT:

Page 269

1    Q    Why -- I guess what I'm trying to get at, they
2 wanted their -- they wanted Old Republic to reimburse
3 their expenses if they settled with the city.
4    MS. CRONIN: Objection.
5 BY MR. WERSANT:
6    Q    That's what you just testified; correct?
7    MS. CRONIN: Objection to form.
8    MR. AGLIANO: Same.
9    THE WITNESS: That's my understanding of the
10 discussions.
11 BY MR. WERSANT:
12    Q    But you said -- you testified before, Old
13 Republic played no part in the settlement with the city.
14    MS. CRONIN: Is that a question?
15    MR. AGLIANO: Form.
16 BY MR. WERSANT:
17    Q    So if Old Republic isn't playing a part in the
18 settlement with the city, why would you have to
19 reimburse them their expenses for doing that?
20    MS. CRONIN: Objection to form.
21    THE WITNESS: We were not a part of the
22 mediation settlement.
23 BY MR. WERSANT:
24    Q    Right.
25    A    That's what I said.

Page 270

1    Q    Right. So then why would you have to
2 reimburse them for their expenses as part of that?
3    MS. CRONIN: Objection to form.
4    MR. AGLIANO: Same.
5    THE WITNESS: They asked us to reimburse them
6 the expenses for their settlement with the city and
7 their continuing fights with the city --
8    MR. WERSANT: Right.
9    THE WITNESS: -- in order to settle at the
10 mediation.
11 BY MR. WERSANT:
12    Q    Did Old Republic desire HJH to enter into this
13 settlement with the city?
14    MS. CRONIN: Objection to form.
15    THE WITNESS: That was between HJH and the
16 city. They wanted to settle, and we were not there.
17 We did not object.
18 BY MR. WERSANT:
19    Q    So what would have happened if Old Republic
20 had declined to sign this document and reimburse HJH for
21 their expenses?
22    MS. CRONIN: Objection to form.
23    MR. AGLIANO: Join.
24    THE WITNESS: I don't know.
25 BY MR. WERSANT:

Page 271

1    Q    So, essentially, under Exhibit 27, Old
2 Republic paid $100,000 and they received a release of
3 any further obligation to pay loss proceeds under this
4 title claim; correct?
5    MS. CRONIN: Objection to form.
6    MR. AGLIANO: Same.
7    THE WITNESS: They received a release from HJH
8 on their claim on this matter under the owner's
9 policy.
10 BY MR. WERSANT:
11    Q    And Old Republic approved Exhibit 27, didn't
12 they?
13    MS. CRONIN: Objection to form.
14    MR. AGLIANO: Same.
15 BY MR. WERSANT:
16    Q    This December settlement agreement.
17    MS. CRONIN: Objection to form.
18    MR. AGLIANO: Same.
19    THE WITNESS: We executed it.
20 BY MR. WERSANT:
21    Q    Yes. At the time -- at the time Old Republic
22 signed this agreement, was it still -- was it still
23 evaluating its obligations to the lender per
24 Ms. McGinnity's September 6th email?
25    MS. CRONIN: Objection to form.

JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
272–275

1      MR. AGLIANO: Same.
2      THE WITNESS: The lender wasn't involved in
3   the settlement.
4   BY MR. WERSANT:
5      Q    Mr. Partin, would you also agree the lender
6   didn't know about this settlement?
7      MS. CRONIN: Objection to form.
8      MR. AGLIANO: Same.
9      THE WITNESS: That settlement doesn't affect
10   the lender. The lender still has coverage under its
11   policy.
12   BY MR. WERSANT:
13      Q    My point of it is, Mr. Partin, Ms. McGinnity
14   is saying in one email we're going to evaluate our
15   obligations about paying the loss proceeds under this
16   policy in September of 2012, and three months later she
17   signed this agreement disposing of the loss proceeds
18   payable under this claim under the owner's policy. Why?
19      MS. CRONIN: Objection to form.
20      MR. AGLIANO: Join.
21   BY MR. WERSANT:
22      Q    Why say one thing in September and --
23      A    She is not a --
24      MS. CRONIN: Objection to form.
25      Sorry, go ahead.

1      THE WITNESS: That did not affect the lender's
2   coverage at all.
3   BY MR. WERSANT:
4      Q    So you don't believe the lender has any
5   secured or other interest in the owner's policy?
6      MS. CRONIN: Objection to form.
7      THE WITNESS: No, it has no interest in the
8   owner's policy.
9   BY MR. WERSANT:
10      Q    So you dispute the language of the assignment
11   of contracts I read you previously?
12      MS. CRONIN: Objection to form.
13      MR. AGLIANO: Same.
14      THE WITNESS: I'm not understanding what
15   you're asking.
16   BY MR. WERSANT:
17      Q    Do you recall the assignment of contracts as
18   part of the mortgage, the assignment of rents, and the
19   other documents expressly provides that HJH assign
20   those -- its contract rights and any insurance policies
21   to the lender.
22      MS. CRONIN: Is that a question?
23      MR. WERSANT: Yes.
24      MS. CRONIN: Objection to form.
25   BY MR. WERSANT:

1      Q    Do you recall that?
2      MR. AGLIANO: Same.
3      MS. CRONIN: Same objection.
4      THE WITNESS: To the best of my belief, we
5   were not aware of that, and Old Republic was not a
6   party to that agreement. We had no obligations
7   whatsoever under that agreement even if we knew
8   about it.
9   BY MR. WERSANT:
10      Q    Would you agree that Old Republic would have
11   knowledge or should have knowledge of anything that its
12   closing agent had in 2004?
13      MS. CRONIN: Objection to form.
14      MR. AGLIANO: Same.
15      THE WITNESS: No.
16   BY MR. WERSANT:
17      Q    So you wouldn't be aware of the fact that this
18   is a -- this document was in Mr. Marks' closing file?
19      MS. CRONIN: Objection to form.
20      MR. AGLIANO: Same.
21      THE WITNESS: No.
22   BY MR. WERSANT:
23      Q    Or that this document was executed as part of
24   the consideration for this overall closing?
25      MS. CRONIN: Objection to form.

1      MR. AGLIANO: Same.
2      THE WITNESS: No.
3      (Exhibit Number 28 was marked for
4   identification.)
5      MR. WERSANT: What exhibit are we on now?
6      THE REPORTER: We're on 28.
7      MR. WERSANT: I'm sorry?
8      THE REPORTER: 28.
9      MR. WERSANT: This is ORNTIC 578 through 584.
10   This is the joint voluntarily dismissal with
11   prejudice from February 5th.
12      MS. CRONIN: Thank you.
13   BY MR. WERSANT:
14      Q    Mr. Partin, to your recollection, did
15   Mr. Donaghy or Mr. Marks have any particular reason for
16   the timing of these settlements?
17      MS. CRONIN: Objection to form.
18      MR. AGLIANO: Form.
19      THE WITNESS: I have no idea.
20   BY MR. WERSANT:
21      Q    Did the judge in the quiet title case compel
22   the parties to mediate in October of 2012?
23      MS. CRONIN: Objection to form.
24      THE WITNESS: I don't know if it was by court
25   order. There typically is a court-ordered mediation



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
276–279

Page 276

1    by statute.  Sometimes the parties agree to do a
2    separate mediation, but usually even if it's a
3    separate agreed-to mediation, it's made pursuant to
4    the statute.
5  BY MR. WERSANT:
6    Q    Did Old Republic also become aware or were
7    they aware that Kahama VI, the current holder of this
8    note and mortgage, filed a collection case in federal
9    court in September 2011?
10       MS. CRONIN:  Objection to form.
11       MR. AGLIANO:  Same.
12  BY MR. WERSANT:
13   Q    Against HJH and the guarantors.
14       MS. CRONIN:  Same objection.
15       THE WITNESS:  I don't know.  I think we
16   generally were aware of it.  That was a matter --
17  BY MR. WERSANT:
18   Q    Well, do you know how Old Republic became
19   aware of that case?
20   A    No.
21       (Exhibit Number 29 was marked for
22   identification.)
23  BY MR. WERSANT:
24   Q    Mr. Partin, have you seen this document
25   before?

Page 277

1    A    Yes.
2    Q    What would be your understanding of this
3  document?
4        MS. CRONIN:  Objection to form.
5        MR. AGLIANO:  Join.
6        THE WITNESS:  This is Kahama's suit against
7    HJH, the principles of HJH, Mr. Marks, Mr. Donaghy,
8    and Old Republic.
9  BY MR. WERSANT:
10   Q    Do you have any understanding as to the claims
11  against the respective defendants here?
12       MS. CRONIN:  Objection to form.
13       MR. AGLIANO:  Join.
14       THE WITNESS:  Generally, yes.
15  BY MR. WERSANT:
16   Q    What's generally your understanding of the
17  claims by Kahama VI against HJH and its members Bahng,
18  Riveiro, and McMillan?
19       MS. CRONIN:  Objection to form.
20       MR. AGLIANO:  Same.
21       THE WITNESS:  I've not specifically reviewed
22   that.
23  BY MR. WERSANT:
24   Q    How about the claims against Marks and
25  Donaghy?

Page 278

1        MS. CRONIN:  Same objection.
2        MR. AGLIANO:  Same.
3        THE WITNESS:  I believe all of them had been
4    dismissed except for one count for fraudulent
5    transfer.
6  BY MR. WERSANT:
7    Q    Do you understand what the fraudulent transfer
8  is a result of?
9        MS. CRONIN:  Objection to form.
10       MR. AGLIANO:  Join.
11       THE WITNESS:  No, I really don't.
12  BY MR. WERSANT:
13   Q    Do you have any understanding of the claims
14  that have been brought in this case against your
15  employer, Old Republic?
16       MS. CRONIN:  Objection to form.
17       THE WITNESS:  Yes.
18  BY MR. WERSANT:
19   Q    What do you understand of those claims,
20  Mr. Partin?
21   A    This is pending litigation.  I'm going to
22  assert the privilege.
23   Q    Okay.  You also filed an answer and
24  affirmative defenses.  What's your --
25       MR. WERSANT:  What exhibit are we on now?

Page 279

1        THE REPORTER:  30.
2        (Exhibit Number 30 was marked for
3    identification.)
4        MR. WERSANT:  That's your answer.
5        MS. CRONIN:  That's our answer minus Exhibit
6    A; right?
7        MR. WERSANT:  Right.
8  BY MR. WERSANT:
9    Q    Let's start where I drew an arrow next to this
10  number 1.  What's the factual basis for that defense,
11  Mr. Partin?
12       MS. CRONIN:  Objection to form.
13       MR. AGLIANO:  Same.
14       MR. WERSANT:  Paragraph 1.
15       MS. CRONIN:  May I take a look at the
16  documents, please?
17       MR. WERSANT:  Sure.
18       MS. CRONIN:  It's paragraph 1 of the
19  affirmative defenses.
20       THE WITNESS:  First of all, the claims are not
21  covered because the plaintiff purchased the loan and
22  was aware of the adverse claims title, and that is
23  excluded by Exclusion 3(a) of the policy.
24       To the extent that plaintiff is claiming
25  damages as a result of the use of the property or

JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
280–283

Page 280

1    the intended use or government regulatory, police
2    powers, those damages are excluded. Those claims
3    are excluded by Exclusion 1(a) of the policy.
4  BY MR. WERSANT:
5    Q    Are you going -- is that all paragraph 1?
6    A    Yes.
7    Q    Are you going paragraph by paragraph?
8    A    No, paragraph 1.
9    Q    Okay.
10   A    That plaintiff has not suffered a loss yet;
11   that any loss would be determined only if the litigation
12   is not successful.
13   Q    You mean the quiet title litigation?
14   A    Yes.
15   Q    Correct me if I'm wrong, Mr. Partin --
16   A    And that --
17   Q    Go ahead.
18   A    -- if there are any damages due to the cure of
19   title not being sufficient, those can only be assessed
20   pursuant to the policy itself, which provide the
21   specific limitation on losses as stated amounts
22   determined under paragraph 7 of the policy, not the loan
23   amount of the policy; and that the loss under the
24   policy, pursuant to the terms of the policy which state
25   the actual loss, may in fact be the amount paid by the

Page 281

1    plaintiff for the loan, not the total amount of the
2    policy.
3    Q    That is the first defense?
4    A    Yes. Also, that the loss may be due to the
5    acts of the plaintiff due to the forbearance of the
6    foreclosure, which could have occurred earlier and
7    mitigated some or most of the loss.
8    Q    So you're saying basically that they should
9    have foreclosed earlier than they did?
10        MS. CRONIN: Objection to form.
11        THE WITNESS: That will be one of our
12   defenses.
13   BY MR. WERSANT:
14   Q    Is that your factual basis for Defense Number
15   1?
16        MS. CRONIN: Objection to form.
17   BY MR. WERSANT:
18   Q    Is that Old Republic's factual basis for its
19   defenses or its Defense Number 1 to this lawsuit?
20        MS. CRONIN: Objection to form.
21        THE WITNESS: Yes.
22   BY MR. WERSANT:
23   Q    All right. What's Defense Number 2? What's
24   your factual basis? What's Old Republic's factual basis
25   for that defense?

Page 282

1    A    The plaintiff is not the insured under the
2    owner's policy, and that there cannot be a third-party
3    beneficiary under the owner's policy pursuant to its
4    terms and without the agreement of Old Republic.
5    Q    How about your factual -- how about Old
6    Republic's factual basis for its defense to -- for
7    Defense Number 3?
8    A    Plaintiff is not an insured under the owner's
9    policy, and there is no third-party beneficiary rights
10   under the owner's policy.
11   Q    Paragraph number 4, what's your factual basis
12   for that, Mr. Partin?
13   A    Again, the forbearance of foreclosure may have
14   mitigated the loss.
15   Q    Well, you're saying in there, though, the
16   plaintiff hindered or impaired Old Republic's
17   performance. What did the plaintiff do to hinder or
18   impair Old Republic's prosecution of this lawsuit?
19        MS. CRONIN: Objection to form.
20        THE WITNESS: We've not been able to complete
21   an investigation because you haven't provided us
22   with requested documents. You've not cooperated --
23        MR. WERSANT: Hold on.
24        THE WITNESS: -- in the investigation of the
25   claim of the plaintiff.

Page 283

1  BY MR. WERSANT:
2    Q    Requested by who and when?
3        MS. CRONIN: Objection to form.
4  BY MR. WERSANT:
5    Q    What was requested --
6        MS. CRONIN: Same objection.
7  BY MR. WERSANT:
8    Q    -- of the plaintiff?
9        MS. CRONIN: Same objection.
10  BY MR. WERSANT:
11   Q    What was requested of the plaintiff,
12  Mr. Partin?
13   A    Among other things, for the amount Kahama paid
14  to purchase the loan, its buyout concerning the property
15  and the loan and its purchase.
16   Q    Mr. Partin, correct me if I'm wrong, you've
17  got -- your company has asked for all that in discovery
18  after we filed the lawsuit. It didn't ask for those
19  items before we filed the lawsuit as part of our title
20  claim. So why are we obliged to cooperate with Old
21  Republic in its defense of this lawsuit? Is that what
22  you're testifying to?
23        MS. CRONIN: Objection to form.
24        MR. AGLIANO: Join.
25  BY MR. WERSANT:



Page 284

1    Q    I want you to tell me under the policy why we
2  are obliged to provide those items and who asked me
3  to -- who asked us to provide those items.
4         MS. CRONIN:  Objection to form and asked and
5    answered.
6         MR. AGLIANO:  Join.
7         THE WITNESS:  The policy requires the
8    insured's cooperation in the investigation and the
9    defense.  And that is an item we are claiming as a
10   defense.
11 BY MR. WERSANT:
12   Q    So you're saying that the plaintiff is obliged
13 to cooperate with Old Republic in its defense of the
14 federal lawsuit?
15   A    No --
16   Q    How do those --
17   A    -- in the title claim.
18        Would you let me finish my answers and not
19 interrupt?
20        In the title claim.  The plaintiff insured has
21 an obligation to cooperate and to provide us with
22 documents for our investigation, and it has not done
23 that.
24   Q    How does the amount that we paid for the loan
25 relate to the title claim, Mr. Partin?

Page 285

1         MS. CRONIN:  Objection to form.
2         MR. AGLIANO:  Join.
3         THE WITNESS:  The policy provides compensation
4    for actual loss.  And the plaintiff only paid a
5    lesser amount on the loan, so its actual loss may in
6    fact be what it paid for the loan, not the policy
7    amount.
8  BY MR. WERSANT:
9    Q    So you are saying that this policy does not
10 provide coverage based upon a $1.3 million loan?
11        MS. CRONIN:  Objection to form.
12 BY MR. WERSANT:
13   Q    Is that what you're saying?
14        MS. CRONIN:  Same objection.
15        THE WITNESS:  It provides coverage pursuant to
16   its terms and the limitation on liability of the
17   provisions of the policy.
18 BY MR. WERSANT:
19   Q    Let's go to the next -- what about -- what's
20 your factual basis for Defense Number 5 here?
21   A    To the extent that Mr. Marks, Burr & Forman,
22 or the former firm, Graham Builder Jones, are claimed to
23 be our agents and we are responsible for the actions of
24 our agents, the title agent is limited to issue title
25 insurance policies and is not responsible for any acts

Page 286

1  of the agent either as a law firm or a closing agent,
2  and we're not on notice of any items other than the
3  title insurance issues.
4    Q    If I may, let me look at this.  All right.
5  What about 6 and 7?
6         MR. AGLIANO:  Form.
7  BY MR. WERSANT:
8    Q    The factual basis for Defense Number 6?
9         MS. CRONIN:  Object to form.
10        THE WITNESS:  The claims of the plaintiff are
11   subject to the terms of the lender's policy, not the
12   owner's policy, including the amount of the loss.
13   The loss provisions of the policy are outlined in
14   paragraph 7 and don't necessarily provide for
15   payment of the policy amount.
16 BY MR. WERSANT:
17   Q    What about Defense Number 7?
18        MS. CRONIN:  Objection.  I don't think he's
19   done with his answer.
20        MR. WERSANT:  If he's not done with his
21   answer, he can complete it.
22        THE WITNESS:  Also, we're not responsible for
23   any loss which results from the issues involving the
24   use or ability to build or locate anything on the
25   property pursuant to Exclusion 1(a).

Page 287

1         Also, again, as mentioned under Number 1, to
2    the extent that the plaintiff was aware of the title
3    problems when they purchased the loan, the claims
4    may be excluded by provision 3(a).
5         Also, if there is no loss, pursuant to the
6    provisions of the policy under 3(d), there's no
7    amount payable under the policy.
8  BY MR. WERSANT:
9    Q    Is that your answer to -- is that regarding
10 Defense Number 6, then?
11   A    Yes.
12   Q    All right.  To summarize Defense Number 7, you
13 are basically saying that the plaintiff's claims are
14 barred to the extent that they -- they are barred under
15 the lender's policy?
16        MS. CRONIN:  Objection to form.
17 BY MR. WERSANT:
18   Q    Or subject to the lender's policy, I should
19 say.
20        MS. CRONIN:  Objection to form.
21        THE WITNESS:  Generally, all the
22   aforementioned provisions of the policy.
23 BY MR. WERSANT:
24   Q    All right.  Paragraph number 8.  Let me ask
25 you specifically.  Paragraph 8 talks about that we



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
288–291

Page 288

1 failed to -- plaintiff failed to allege, even generally,
2 satisfaction of waiver of conditions precedent and has
3 failed to satisfy conditions precedent...
4 And what you're saying -- and this says the
5 insured, being the plaintiff, did not give notice of a
6 covered loss. And would that relate to your allegation
7 that we have to provide the amount -- the plaintiff has
8 to provide the amount that it paid for its loan?
9 MS. CRONIN: Objection to form.
10 MR. AGLIANO: Join.
11 THE WITNESS: Paragraph 8, we've not been
12 provided with a proof of loss, and we've not been
13 able to complete our investigation because you
14 haven't provided us with documents or information,
15 such as the amount paid for the loan.
16 BY MR. WERSANT:
17 Q So you're saying -- so Old Republic's position
18 is that the original title claim that we filed -- well,
19 let me ask you something.
20 Let me ask you something, Mr. Partin. Liz
21 McGinnity indicated in 2012 that Old Republic was not
22 going to hire counsel to represent us in this lawsuit,
23 in the quiet title case; she would not retain counsel to
24 represent Kahama's interest in this quiet title case.
25 And there was no further mention of having a claim. In

Page 289

1 fact, the claim was essentially denied.
2 We had asked -- when we filed the claim, we
3 asked -- Kahama asked that she obtain counsel to
4 represent our interest in that case. She denied that
5 claim.
6 So why is the plaintiff obliged to cooperate
7 on a claim that Old Republic has already denied?
8 MS. CRONIN: Objection to form and asked and
9 answered.
10 MR. AGLIANO: Join.
11 THE WITNESS: We did not deny the claim. At
12 the time, the issues were the same for the owner and
13 the lender, and the claim was adequately defended by
14 counsel retained by us.
15 BY MR. WERSANT:
16 Q But you would also agree that Ms. McGinnity
17 never sent followup correspondence saying please provide
18 me with the amount that you paid for the loan to
19 investigate your claim; correct?
20 MS. CRONIN: Objection to form.
21 THE WITNESS: We are asking for that -- we've
22 asked for that subsequently and in this litigation.
23 BY MR. WERSANT:
24 Q You asked for it as a defense to this
25 litigation. You didn't ask for it as part of our title

Page 290

1 claim; correct?
2 MS. CRONIN: Objection to form.
3 THE WITNESS: We asked for it.
4 BY MR. WERSANT:
5 Q Paragraph 9. I'm assuming that's referring to
6 the language of the lender's policy, again?
7 MS. CRONIN: Objection to form.
8 THE WITNESS: No loss has been sustained yet
9 and won't be sustained until the final adjudication
10 of the pending litigation to cure the title.
11 MR. WERSANT: What exhibit are we on now?
12 THE REPORTER: That will be 30 -- actually, 30
13 is this. So this is 31.
14 (Exhibit Number 31 was marked for
15 identification.)
16 BY MR. WERSANT:
17 Q Mr. Partin, I'll show you what's been marked
18 as Exhibit 31.
19 A Are we finished with that?
20 Q We're finished with that, but this is going to
21 be part of the question.
22 A Yes.
23 Q Would it be fair to say that that document is
24 the counterclaim brought by Volusia County after the
25 filing of this quiet title case to establish this

Page 291

1 dedication of the beach front property?
2 MS. CRONIN: Objection to form.
3 MR. AGLIANO: Join.
4 THE WITNESS: All right. Would you repeat
5 your question?
6 BY MR. WERSANT:
7 Q Would it be your understanding in reviewing
8 that counterclaim that Volusia County's counterclaim in
9 response to this quiet title lawsuit is seeking to
10 establish a dedication as to the -- as to the beach
11 front portion of the disputed property?
12 MS. CRONIN: Objection to form.
13 MR. AGLIANO: Same.
14 THE WITNESS: Sorry. I don't understand the
15 question.
16 BY MR. WERSANT:
17 Q Well, there's a dispute over whether Old
18 Republic -- whether the County of Volusia has a
19 dedication on the beach part of the property; correct?
20 MS. CRONIN: Objection to form.
21 MR. AGLIANO: Same.
22 THE WITNESS: There is a dispute, yes.
23 BY MR. WERSANT:
24 Q And in their counterclaim they are asking the
25 court to establish that Volusia County has a public



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
292–295

Page 292

1  dedication on that beach; correct?
2       MS. CRONIN: Objection to form.
3       MR. AGLIANO: Join.
4       THE WITNESS: I don't understand the question.
5   But the court has ruled in this and we are now
6   appealing that.
7  BY MR. WERSANT:
8    Q    But Volusia County established -- wanted to
9   establish a dedication of the property in this
10  counterclaim, didn't they?
11      MS. CRONIN: Objection to form.
12      MR. AGLIANO: Same.
13      THE WITNESS: Were you speaking about the
14  dedication in the 1917 plat?
15      MR. WERSANT: Correct. Correct. Based on the
16  1917 plat.
17      THE WITNESS: Okay. Yes, they were.
18  BY MR. WERSANT:
19   Q    I'm saying that's their position.
20      MS. CRONIN: Objection to form.
21      MR. AGLIANO: Join.
22      (Exhibit Number 32 was marked for
23  identification.)
24  BY MR. WERSANT:
25   Q    All right. And this in fact -- this

Page 293

1  Exhibit 32, have you seen a copy of this document
2  before, Mr. Partin?
3   A    Yes.
4   Q    You'd agree that's the final judgment entered
5  in the quiet title case?
6   A    Yes.
7   Q    After the trial?
8   A    Yes.
9   Q    Are you also aware that the county is now
10  asserting claims for attorney's fees in excess of
11  $45,000 for defending the civil rights claim that they
12  prevailed upon?
13      MS. CRONIN: Objection to form.
14      THE WITNESS: No, I was not aware of that.
15  BY MR. WERSANT:
16   Q    Are you aware that the HJH defendants were
17  ordered to pay the latest taxes due and owing on the
18  property, which they have not?
19   A    Yes, I was aware of that.
20   Q    So who do you expect is going to end up paying
21  those taxes?
22      MS. CRONIN: Objection to form.
23      MR. AGLIANO: Join.
24      THE WITNESS: I don't know.
25  BY MR. WERSANT:

Page 294

1    Q    Would you expect that the lenders are again
2  going to have to pay those taxes to protect our lien
3  again?
4       MS. CRONIN: Objection to form.
5       MR. AGLIANO: Same.
6       THE WITNESS: That may be true.
7  BY MR. WERSANT:
8    Q    Would you also expect -- do you expect the
9  lender -- again, what would you expect would happen with
10  the appeal if the lender, meaning Kahama, moves forward
11  with this foreclosure now?
12      MS. CRONIN: Objection to form.
13      MR. AGLIANO: Same.
14      THE WITNESS: The appeal will proceed.
15  BY MR. WERSANT:
16   Q    If HJH is foreclosed out, would they still
17  have a standing to pursue this appeal?
18      MS. CRONIN: Objection to form.
19      MR. AGLIANO: Join.
20      THE WITNESS: I don't know.
21  BY MR. WERSANT:
22   Q    If HJH no longer had the standing to pursue
23  this appeal, would it be Old Republic's position they
24  could compel Kahama to complete this appeal?
25      MS. CRONIN: Objection to form.

Page 295

1       MR. AGLIANO: Join.
2       THE WITNESS: I believe the policy provides
3  that.
4  BY MR. WERSANT:
5    Q    So an insured could be compelled to
6  participate in a lawsuit that they don't believe has any
7  factual or legal merit?
8       MS. CRONIN: Objection to form.
9       MR. AGLIANO: Join.
10      THE WITNESS: It also provides that.
11  BY MR. WERSANT:
12   Q    In your position on paragraph -- Old
13  Republic's position on paragraph 9, is your -- it's Old
14  Republic's -- it's entitled to pursue this appeal to a
15  final determination of its claim; correct?
16      MS. CRONIN: Objection to form.
17      MR. AGLIANO: Join.
18      THE WITNESS: That is a right under the
19  policy, yes.
20  BY MR. WERSANT:
21   Q    What about the factual basis for Defense
22  Number 10, Mr. Partin. It says, "Claimant's claims are
23  barred because it suffered no compensable loss, and any
24  loss it suffered is due to its own acts or omissions."
25      And, again, what are plaintiff's acts and



Page 296

1 omissions regarding this claim? What are its acts and
2 omissions?
3     A    The forbearance of the foreclosure, and it
4 suffered no compensable loss under the terms of the
5 policy because the litigation has not been pursued to
6 final determination, and that some or all of the losses
7 are due to market fluctuations and are not losses
8 payable under the Old Republic policy, that the losses
9 payable under the policy are pursuant to paragraph 7 of
10 the conditions and stipulations --
11    Q    If I may ask you, though --
12    A    -- and/or either the lesser of the policy
13 amount, the amount of the indebtedness or the value of
14 the property with the encumbrance and the value of the
15 property without the encumbrance.
16    Q    Can you point me to the language in this loan
17 policy that says the lender's damages are limited to the
18 value that it paid for its loan?
19        MS. CRONIN: Objection to form.
20        MR. AGLIANO: Join.
21        THE WITNESS: The beginning of paragraph 7.
22 BY MR. WERSANT:
23    Q    What about paragraph 8, subsection paragraph
24 2?
25        MS. CRONIN: Objection to form.

Page 297

1 BY MR. WERSANT:
2     Q    "The amount of the unpaid principal
3 indebtedness secured by the insured mortgage is limited
4 or provided under Section 6 of these conditions and
5 stipulations."
6     A    Well, that's limited, but --
7        MS. CRONIN: Objection to form.
8        Go ahead.
9        THE WITNESS: Which provision were you reading
10 from?
11        MR. WERSANT: Here, let me --
12        MS. CRONIN: We're probably going on seven and
13 a half hours now. Paul, can you finish this up
14 pretty quick?
15        MR. WERSANT: I am. I appreciate your
16 patience.
17 BY MR. WERSANT:
18    Q    I highlighted another section under that. The
19 first highlighted section refers to the unpaid
20 indebtedness.
21    A    That's one of the possibilities under that
22 paragraph. But you must read it from the beginning of
23 A: "The liability of the company under this policy
24 shall not exceed the least of: the amount of insurance;
25 the amount of the unpaid principle indebtedness secured

Page 298

1 by the mortgage; or the difference between the value of
2 the insured estate or interest as insured and the value
3 of the insured estate or interest subject to the defect,
4 lien or encumbrance insured against by this policy."
5     Q    But you agree nowhere in there does it say
6 that the lender is limited to the amount -- that the
7 lender's damages are limited to the amount that it paid
8 for the loan?
9        MS. CRONIN: Objection. Asked and answered.
10        THE WITNESS: It says --
11        MS. CRONIN: And form.
12        THE WITNESS: -- "This is a policy" -- "This
13 policy is a contract of indemnity against actual
14 monetary loss or damage sustained or incurred by the
15 insured claimant..."
16 BY MR. WERSANT:
17    Q    I understand that -- I know what these words
18 say, Mr. Partin, but the point is, I want you to point
19 to me the specific language in there saying that that
20 actual loss is measured by the amount that this lender
21 paid for this loan.
22        MS. CRONIN: Objection --
23 BY MR. WERSANT:
24    Q    Because you've listed three conditions that
25 don't mention that condition.

Page 299

1        MS. CRONIN: Objection to form. Asked and
2 answered.
3        You can answer it again, if you want.
4        MR. AGLIANO: Join.
5 BY MR. WERSANT:
6     Q    I'd just like you to point me where those
7 exact words --
8        MS. CRONIN: Which words?
9        MR. WERSANT: Exact words.
10 BY MR. WERSANT:
11    Q    -- the limitation of damages appear there.
12    A    Kahama is now the insured claimant. Kahama
13 only paid an amount for the loan. I believe -- we
14 believe that is the actual monetary loss suffered by
15 Kahama, the insured claim.
16    Q    That's what you believe?
17    A    That's our position.
18    Q    But those words do not appear on this
19 document?
20        MS. CRONIN: Objection to form.
21        The words that Mr. Partin just stated on the
22 record do not appear in the policy? Is that your
23 question?
24        MR. WERSANT: I've asked several times. I
25 would like you to show me the part of the policy,



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
300–303

Page 300
1   this witness, that indicates that the lender's
2   damages are limited to the amount that it paid for
3   its loan.
4       MS. CRONIN: And he showed you three times.
5   Do you want him to show you again?
6       MR. WERSANT: I don't see it.
7       MS. CRONIN: Okay. Well, it's --
8       MR. WERSANT: It's not -- because the words
9   don't appear in that --
10      MS. CRONIN: Ask him the question one more
11   time, and he'll answer one more time.
12  BY MR. WERSANT:
13   Q   I mean, what you're arguing is basically
14  against the actual monetary loss or damages sustained.
15  That's your interpretation of that phrase; right?
16      MS. CRONIN: Objection to form.
17      THE WITNESS: By the insured claimant, which
18   is Kahama.
19  BY MR. WERSANT:
20   Q   To your knowledge, has Old Republic ever paid
21  a loss to a lender based purely on the amount that the
22  lender paid for that loan?
23      MS. CRONIN: Objection to form.
24      MR. AGLIANO: Join.
25      THE WITNESS: We have taken that position, and

Page 301
1   I do not recall any specific one. But that is a
2   position we take. We have taken that in other
3   cases.
4   BY MR. WERSANT:
5    Q   And to your knowledge, Mr. Partin, is that --
6   is that presumption or assumption or defense supported
7   under Florida law?
8       MS. CRONIN: Objection to form. He's not here
9    as an expert. He's already told you he's not even
10   admitted in Florida.
11      MR. AGLIANO: Join.
12      MR. WERSANT: That's true, but he's also here
13   as a witness for this title insurance company.
14      MS. CRONIN: I'm standing on my objection.
15      Answer the question if you can.
16      THE WITNESS: I'm not aware of any case one
17   way or the other on that issue.
18  BY MR. WERSANT:
19   Q   Paragraph 12. If you can -- if you've already
20  covered the factual basis in a prior -- regarding a
21  prior defense, you can point me to that defense.
22   A   I would answer that that has been specified in
23  some of the prior defenses, the facts surrounding that.
24   Q   Do you know which defenses, specifically? Can
25  you point to one, that would be -- that would summarize

Page 302
1   it.
2       MS. CRONIN: Can you ask the question again,
3    please? I'm not sure I even understand it. What
4    are you asking?
5       MR. WERSANT: We're talking about the factual
6    basis for Defense Number 12.
7       MS. CRONIN: Okay.
8   BY MR. WERSANT:
9    Q   So I guess my point is, the obligation we
10  failed to perform applicable to us under the lender's
11  policy, and because it has not suffered a loss?
12   A   Not filed a proof of loss, not cooperated and
13  provided information to complete the investigation, and
14  that it has not yet suffered a loss covered by the
15  lender's policy because there's not been a final
16  determination in the pending title claim -- the title
17  curative action. Excuse me.
18   Q   Would that also include the amounts that the
19  plaintiff advanced to protect its lien interest in
20  paying the taxes?
21      MS. CRONIN: Objection to form?
22      MR. AGLIANO: Join.
23      THE WITNESS: It may if paragraph 7(a)(2) is
24   the applicable loss limitation provision.
25  BY MR. WERSANT:

Page 303
1    Q   All right. Paragraph 13 -- or Defense Number
2   13, Waiver and Estoppel. Actually, basically, the
3   plaintiffs and its predecessor's conduct or omissions
4   under the doctrine of waiver and estoppel.
5    A   The failure to prosecute the original
6   foreclosure suit and allowing that to be dismissed for
7   lack of prosecution.
8    Q   Mr. Partin, would Old Republic's position be
9   that if plaintiff forecloses this loan against the
10  property and takes title to it, that we will step into
11  HJH's shoes under the owner's policy?
12      MS. CRONIN: Objection to form.
13      MR. AGLIANO: Join.
14      THE WITNESS: No.
15  BY MR. WERSANT:
16   Q   We will not? Would Old Republic hire counsel
17  to represent plaintiff's interest regarding this
18  property if we foreclosed on it?
19      MS. CRONIN: Objection to form.
20      MR. AGLIANO: Join.
21      THE WITNESS: The forbearance of foreclosure
22   was an action elected by the plaintiff, and if they
23   had chosen to foreclose, then we might have been
24   able to resolve this with the lender without the
25   owner's involvement.



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
304–307

Page 304

1 BY MR. WERSANT:
2    Q    What do you mean "without the owner's
3 involvement"?
4    A    Well, a lot of the concern is what the owner
5 was doing. And if the lender had timely foreclosed, we
6 wouldn't have had the owner as an insured; we would only
7 have to deal with the lender's claim, and that may have
8 affected the resolution of the claim with the city and
9 with the county.
10    Q    Well, what I'm asking is if the lender
11 forecloses now in 2014 and takes title to the property,
12 would Old Republic provide title counsel at its expense
13 to represent Kahama's interest regarding this property?
14        MS. CRONIN: Objection to form.
15        MR. AGLIANO: Join.
16        THE WITNESS: At this point in time, I don't
17    think we could put Kahama into the appeal. But,
18    again, if Kahama had -- or the previous lender had
19    timely foreclosed, they would be the plaintiff.
20 BY MR. WERSANT:
21    Q    So you're saying there is really nothing Old
22 Republic could do for Kahama even if it does foreclose
23 now?
24        MS. CRONIN: Objection to form.
25 BY MR. WERSANT:

Page 305

1    Q    There's nothing it would do?
2        MR. AGLIANO: Join.
3        MS. CRONIN: Same objection.
4 BY MR. WERSANT:
5    Q    Do you understand the question, Mr. Partin?
6    A    No, I don't.
7    Q    Let me rephrase that, then. If Kahama
8 forecloses now, is there anything that Old Republic --
9 would Old Republic not substitute it as the plaintiff in
10 the quiet title appeal?
11        MS. CRONIN: Objection to form.
12        MR. AGLIANO: Same.
13        THE WITNESS: I said I don't know if it would
14    be procedurally allowed.
15 BY MR. WERSANT:
16    Q    Would Old Republic then continue to prosecute
17 the appeal in the name of HJH?
18        MS. CRONIN: Objection to form.
19        THE WITNESS: We would attempt to. It depends
20    on what the county would then file as to standing.
21 BY MR. WERSANT:
22    Q    Paragraph 15 or Defense 15, "...justified and
23 privileged" -- "Old Republic's actions and conduct were
24 justified and privileged, and otherwise taken in good
25 faith."

Page 306

1    A    We were taking action pursuant to the terms of
2 the policy and defending the title, and those actions
3 are allowed under the policy and were taken in good
4 faith to cure title.
5    Q    And Defense 16 --
6        MS. CRONIN: Objection to form.
7 BY MR. WERSANT:
8    Q    -- the factual basis for that?
9        MS. CRONIN: Same objection.
10        MR. AGLIANO: Join.
11        THE WITNESS: Again, Kahama acquired the loan
12    with knowledge of the title issue, and this may not
13    be covered pursuant to paragraph 3(a) of the
14    exclusions from coverage.
15 BY MR. WERSANT:
16    Q    And paragraph 17 or Defense 17?
17    A    To the extent that Kahama is claiming
18 negligence in the title search or other issues regarding
19 the title search, the title insurance policy is the only
20 applicable contract. And pursuant to paragraph 14 of
21 the conditions and stipulations, Old Republic is only
22 responsible pursuant to the policy obligations and no
23 others. And the agreement between the insured and Old
24 Republic is solely the policy obligations.
25    Q    In paragraph 18, as far as failure to mitigate

Page 307

1 damages, it's Old Republic's position that plaintiff
2 should have just mitigated its damages by foreclosing
3 sooner?
4        MS. CRONIN: Objection to form.
5        MR. AGLIANO: Join.
6        THE WITNESS: And the forbearance agreement
7    with the owner, and that they had to foreclose.
8 BY MR. WERSANT:
9    Q    But you have no knowledge of whether there was
10 a forbearance agreement, do you, Mr. Partin?
11        MS. CRONIN: Objection to form.
12        THE WITNESS: It has been mentioned. I do not
13    know the exact terms of it.
14 BY MR. WERSANT:
15    Q    But you don't know if one exists or not? Or
16 Old Republic doesn't know if one exists or not?
17        MS. CRONIN: Objection to form.
18        MR. AGLIANO: Join.
19        THE WITNESS: No, we haven't completed
20    discovery and the insured has not complied with our
21    request for information in the investigation.
22 BY MR. WERSANT:
23    Q    Well, how about HJH? Have they provided any
24 information to substantiate the existence of an
25 agreement to the title company?



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
308–311

Page 308

1     MS. CRONIN:  Objection to form.
2     THE WITNESS:  I believe they have mentioned
3   it, but they have not provided any written
4   agreement, to my knowledge.
5 BY MR. WERSANT:
6   Q    And would Old Republic's position be that HJH
7 at all times cooperate with them in the prosecution of
8 this quiet title case?
9     MS. CRONIN:  Objection to form.
10     MR. AGLIANO:  Join.
11     THE WITNESS:  I'm not aware of any issue that
12   they refused to agree to.
13     (Exhibit Number 33 was marked for
14   identification.)
15 BY MR. WERSANT:
16   Q    Have you seen this document before,
17 Mr. Partin?
18   A    Yes.
19   Q    What is that document?
20   A    This is the docket sheet for the foreclosure
21 that was, I think, dismissed for lack of prosecution.
22   Q    How did Old Republic come across this
23 document?
24   A    I don't know.
25     MS. CRONIN:  Objection to form.

Page 309

1 BY MR. WERSANT:
2   Q    How did they come to be in your file?
3     MS. CRONIN:  Objection to form.
4     THE WITNESS:  I don't know.
5 BY MR. WERSANT:
6   Q    To your knowledge, were either of your
7 predecessors monitoring that foreclosure case?
8     MS. CRONIN:  Objection to form.
9     THE WITNESS:  I assume they were, but I don't
10   know.
11 BY MR. WERSANT:
12   Q    You assumed they were, but you don't know?
13   A    No, I assumed they were.
14   Q    You assumed they were.  Why would you assume
15 that they were monitoring it?
16   A    It's something that I would monitor.
17   Q    Why would you monitor it?
18   A    Just to see how they are proceeding in the
19 foreclosure.
20   Q    To see if they actually foreclosed?
21   A    Yes.
22   Q    All right.  So if the lender foreclosed in
23 this foreclosure, what would Old Republic have done
24 then?
25     MS. CRONIN:  Objection to form.

Page 310

1     THE WITNESS:  I believe we would have added
2   them to the suit as a plaintiff in the quiet title
3   action as the owner.
4 BY MR. WERSANT:
5   Q    Would you have done -- but you would have
6 sought their consent to do that first?
7     MS. CRONIN:  Objection to form.
8     THE WITNESS:  We would have told them that we
9   were -- we were filing the suit in their name
10   pursuant to the terms of the policy is what we
11   usually do.
12 BY MR. WERSANT:
13   Q    Do you recall -- do you recall the initial
14 communication that Kahama made with Ms. McGinnity
15 through me regarding the quiet title case?
16     MS. CRONIN:  Objection to form.
17     THE WITNESS:  Yes.
18 BY MR. WERSANT:
19   Q    Do you recall there was -- there was a
20 statement in that claim that Kahama had actually offered
21 to take over the quiet title case and prosecute it with
22 the assistance of Old Republic in order to effectuate a
23 resolution to that lawsuit.  Do you recall that?
24     MS. CRONIN:  Objection to form.
25     MR. AGLIANO:  Join.

Page 311

1     THE WITNESS:  Yes.
2 BY MR. WERSANT:
3   Q    In fact, you offered -- in fact, Kahama
4 actually offered my assistance as an experienced title
5 attorney to handle that lawsuit?
6     MS. CRONIN:  Is that a question?
7     MR. WERSANT:  Yes.
8 BY MR. WERSANT:
9   Q    Do you recall that?
10   A    Yes.
11     MS. CRONIN:  Objection to form.
12 BY MR. WERSANT:
13   Q    And Old Republic actually rejected that offer?
14     MS. CRONIN:  Objection to form.
15     THE WITNESS:  Well, Ms. McGinnity said that we
16   had already retained counsel, and he was prosecuting
17   the case, and --
18 BY MR. WERSANT:
19   Q    Well, was Ms. McGinnity, her predecessors, or
20 you aware of the fact that Howard Marks is personal
21 friends with the obligor -- with one of the obligors
22 under this loan, Robert McMillan?
23     MR. AGLIANO:  Object to form.
24     MS. CRONIN:  Objection to form.
25     THE WITNESS:  I am now.  I wasn't before the



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014

312–315

1    mediation.
2  BY MR. WERSANT:
3    Q    Well, don't you think that Mr. Marks would
4  also have an incentive to delay the foreclosure against
5  his friend?
6        MR. AGLIANO:  Objection to form.
7        MS. CRONIN:  Object.
8  BY MR. WERSANT:
9    Q    His drinking Buddy?
10       MS. CRONIN:  Object to form.
11       THE WITNESS:  I don't know anything about
12    that.
13 BY MR. WERSANT:
14   Q    But you don't -- but you don't think that
15 someone who is someone else's friend would want to delay
16 that foreclosure so they wouldn't have a judgment
17 entered against them?
18       MS. CRONIN:  Objection.
19       MR. AGLIANO:  Join.
20       MS. CRONIN:  Form.
21       THE WITNESS:  I don't know what their
22    relationship is.  The only thing I know is that
23    Mr. McMillan is a client of Mr. Marks in some other
24    matters.
25 BY MR. WERSANT:

1    Q    Were you also -- was Old Republic also aware
2  that Mr. McMillan actually absconded to Panama for an
3  extended period of time?
4        MR. AGLIANO:  Object to form.
5        MS. CRONIN:  Objection to form.
6  BY MR. WERSANT:
7    Q    Left the country?
8        MS. CRONIN:  Objection to form.
9        THE WITNESS:  I've heard allegations of that,
10    but I had no knowledge of that until the mediation.
11 BY MR. WERSANT:
12   Q    And are you aware of the fact that the money
13 that HJH received under the settlement from Old Republic
14 was actually used to pay for their -- HJH's defense of
15 this federal lawsuit?
16       MS. CRONIN:  Objection to form.
17       MR. AGLIANO:  Join.
18       THE WITNESS:  No, I don't.
19       MR. WERSANT:  I have nothing else today.
20       MS. CRONIN:  Okay.  I would like to take a
21    little break because I think I'm going to have some
22    cross.
23       So, let's take a little break here.  Take a --
24    well, it's 6:15, so ten minutes.
25       (A recess was taken, 6:13 p.m. to 6:23 p.m.)

1                EXAMINATION
2  BY MS. CRONIN:
3    Q    Mr. Partin, I'm going to direct your attention
4  to Exhibit 3.  Could you identify this as the loan
5  policy in this case?
6    A    Yes.
7    Q    And I want to direct your attention to
8  paragraph 8(d)(i), and I'll be happy to flip you to it
9  in the exhibit, if you'd like.  8(d)(i).
10   A    Yes.
11   Q    Okay.  You remember testifying about that
12 provision in response to questions from Mr. Wersant?
13   A    Yes.
14   Q    So that talks about advances made by the
15 lender to maintain the priority of its lien, such
16 advances being secured as indebtedness under the
17 mortgage, does it not?
18   A    Correct.
19   Q    Okay.  So is it the company's position, then,
20 that such advances are recoverable to the extent they
21 make up part of the loss that an insured lender may
22 suffer?
23   A    If the loss is determined under paragraph
24 7(a)(ii).
25   Q    7(a)(ii)?

1    A    Yes.
2    Q    So in this instance where you've got a lender
3  like Kahama acquires a loan for whatever X-dollars it
4  paid and then makes advances pursuant to the loan
5  documents in order to preserve its priority, those sums
6  that it advanced will be recoverable to the extent that
7  the security for the loan has been diminished by the
8  title problem; is that correct?
9        MR. WERSANT:  Objection as to --
10       THE WITNESS:  I'm sorry.  Would you repeat the
11    question?
12       MS. CRONIN:  Sure.  It's late in the day.
13    I'll try to be as clear as I can.
14 BY MS. CRONIN:
15   Q    Let's just take this loan, for example.  All
16 right.  And I'll put some hard numbers to it.  Maybe
17 that will make it a little simpler.
18       Let's assume that Kahama paid $500,000.  Okay?
19 That's its actual investment into this loan.  All right?
20 That's what it paid to take assignment of this loan.
21       And further assume that Kahama advanced
22 $200,000 to pay taxes that were due on the property,
23 okay, making its -- bringing its investment to 700.
24       Further on this hypothetical, you continue the
25 appeal of the final judgment entered in the quiet title



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
316–319

Page 316

1 case and you lose, and you go get an appraisal, and the
2 appraisal comes back, and Kahama forecloses on its
3 mortgage, and then resells the property for a million
4 dollars following the foreclosure. Okay? Or the
5 appraisal says as of the date of foreclosure, the
6 property is worth a million bucks.
7    Do you believe that it would be the company's
8 position that Kahama had suffered no loss on its
9 $700,000 investment?
10 A    Yes.
11    MR. WERSANT: Objection as to form.
12 BY MS. CRONIN:
13 Q    Now, change the appraisal or the sale price of
14 the property post-foreclosure and let's say the property
15 could appraise -- because of the defect, the property
16 does not appraise out at 500; it appraises out at 300.
17 Kahama has $700,000 into the deal, and its security is
18 worth 300, not 500, because of the title defect.
19    Are you following me?
20 A    Yes.
21 Q    Okay. Would Kahama have suffered a loss under
22 those circumstances?
23    MR. WERSANT: Objection as to form.
24    THE WITNESS: It would. There would be a loss
25    payable under the policy, but pursuant to 7(a)(iii),

Page 317

1    that's the difference between the value of the
2    property with the defect and without the defect,
3    which would be, in your hypothetical, 200,000.
4 BY MS. CRONIN:
5 Q    Mr. Partin, did you spend a considerable
6 amount of time reviewing documents to prepare for this
7 deposition?
8    MR. WERSANT: Objection as to form.
9    MS. CRONIN: Let me rephrase that.
10 BY MS. CRONIN:
11 Q    Did you spend more than two hours reviewing
12 documents to prepare for this deposition?
13    MR. WERSANT: Objection as to form.
14    THE WITNESS: Yes.
15 BY MS. CRONIN:
16 Q    More than four hours?
17 A    Yes.
18 Q    More than five hours?
19 A    Yes.
20 Q    Are you familiar with the volume of documents
21 that Old Republic has produced in connection with this
22 litigation?
23    MR. WERSANT: Objection as to form.
24    THE WITNESS: Yes.
25 BY MS. CRONIN:

Page 318

1 Q    Do you have a perfect memory, Mr. Partin?
2 A    Absolutely not.
3    MR. WERSANT: Objection as to form.
4 BY MS. CRONIN:
5 Q    So if Mr. Wersant might have asked you if
6 you've ever seen a document that he identified as having
7 come from Old Republic's claim file or that in fact came
8 from Old Republic's claim file, could you say with
9 100 percent certainty that you had or had not seen that
10 document?
11 A    No.
12    MR. WERSANT: Objection as to form.
13 BY MS. CRONIN:
14 Q    In the quiet title lawsuit, weren't the
15 government entities asserting two basic rights: one to
16 fee; one to a right to use --
17    MR. WERSANT: Objection as to form.
18 BY MS. CRONIN:
19 Q    -- HJH's property?
20 A    Yes.
21 Q    Referring to Exhibit 31, Volusia County's
22 counterclaim -- do you recall testifying in response to
23 Mr. Wersant's questions concerning the counterclaim?
24 A    Yes.
25 Q    There are three counts in the counterclaim,

Page 319

1 aren't there?
2 A    I didn't review them all. I just looked for
3 the one he was speaking or, or asking questions about.
4 Q    I'd like you to read to yourself the fact
5 allegations that comprise Count I of Volusia County's
6 counterclaim and tell me if you see anything there about
7 a dedication or any other type of conveyance of a right
8 to the property.
9 A    Could you repeat the question, please?
10 Q    Sure.
11    I asked you to review the allegations in
12 Count I of the counterclaim filed by Volusia County. I
13 asked you to tell us whether or not there was anything
14 in that Count I of that counterclaim that allege that
15 there had been some kind of express dedication or
16 conveyance to the public or the county or the city of
17 any right in the HJH property.
18 A    No. This is only an allegation concerning the
19 use by the public of the beach up to the line of
20 vegetation.
21 Q    Okay. So there's no allegation that there was
22 a dedication or conveyance in Count I?
23 A    No.
24 Q    Okay. I'll direct your attention in the
25 meantime to Exhibit 4. All right? Okay. Mr. Marks in



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
320–323

Page 320

1  Exhibit 4 -- that's the letter from Mr. Marks to Donna
2  Roberts referencing the claim being submitted by HJH; is
3  that correct?
4    A   Yes.
5    Q   And that letter refers in several different
6  places to enclosures that Mr. Marks included with that
7  letter; isn't that right?
8    A   Yes.
9    Q   Okay.  Mr. Wersant asked you whether or not
10  you had ever seen any document in Old Republic's claim
11  file in which the city or the county indicated or
12  claimed that they owned fee title to any portion of
13  HJH's property.  Do you remember that line of
14  questioning?
15    A   Yes.
16        MR. WERSANT:  Objection as to form.
17        THE WITNESS:  Yes.
18  BY MS. CRONIN:
19    Q   Is it possible that there is a document in Old
20  Republic's claim file that in fact does reflect taking
21  exactly that position, that it owned fee simple title to
22  the east 150 feet of the platted lot that HJH claimed as
23  its own?
24        MR. WERSANT:  Objection as to form.
25        THE WITNESS:  There may be.  I did not review

Page 321

1  the entire file, just basically the requirements and
2  the request in the notice of deposition.
3  BY MS. CRONIN:
4    Q   Exhibit 4 includes none of the attachments
5  that were referenced in Mr. Marks' letter; isn't that
6  the case?
7    A   It does not.
8        MR. WERSANT:  Objection as to form.
9  BY MS. CRONIN:
10    Q   Mr. Wersant asked you a series of questions
11  concerning coverage counsel versus -- excuse me --
12  coverage counsel as representing an insured.  Do you
13  recall that line of questioning?
14        MR. WERSANT:  Objection as to form.
15        THE WITNESS:  Not in that specific word, but,
16        yes, I remember the question that created a
17        confusion about it.
18  BY MS. CRONIN:
19    Q   So can you explain the role of coverage
20  counsel versus the role of outside or retained counsel?
21    A   Coverage counsel is counsel retained by Old
22  Republic to review the claim and advise us on coverage
23  issues, whether coverage is likely provided or not
24  provided by the policy, first, and what our obligations
25  may be to resolve the claim.

Page 322

1  Retained outside counsel for the insured is a
2  term that I use to refer to counsel that is retained to
3  represent the insured pursuant to our obligations in the
4  policy to provide a defense or cure title on behalf of
5  the insured.
6    Q   Are you familiar with the doctrine of
7  splitting causes of action?
8        MR. WERSANT:  Objection as to form.
9        THE WITNESS:  Vaguely.
10  BY MS. CRONIN:
11    Q   When you have retained counsel for an insured,
12  who does that counsel represent?
13    A   The insured.
14    Q   Does that counsel represent the insurance
15  company in connection with that matter?
16    A   No.
17    Q   I'm going to show you a copy of Exhibit --
18  excuse me.  I'm going to show you Exhibit 32, Final
19  Judgment.  Are you familiar with that document,
20  generally?
21    A   Yes.
22    Q   Okay.  Mr. Wersant had a line of questioning
23  asking you whether or not HJH has fee title to the
24  property.  Do you remember that line of questioning?
25    A   Yes.

Page 323

1    Q   Okay.  Do you know whether that final judgment
2  determines that HJH owns fee title to the property at
3  issue, including the 150 feet that comprises the east
4  part of that lot that was in dispute with the county and
5  the city?
6    A   Yes.  Just generally the court held that MRTA
7  applied to the fee title.  So the 1967 deed was a MRTA
8  deed.  And so MRTA resolved the issue of the fee title.
9  But then the court ruled that there was a dedicated
10  street or right of way not in fee but as an easement
11  that had been dedicated by the 1917 plat.  Even though
12  it wasn't -- it wasn't dedicated per se, it was an
13  easement by public usage -- I guess is the best way I
14  could explain it.
15        So the fee title was encumbered with an
16  easement over the 150 feet disputed, and that -- so the
17  insured has the title to that, but they must allow
18  access over it for the public.
19    Q   Mr. Wersant was asking you questions about
20  provisions in the owner's policy that permit the company
21  to make a payment of loss under the owner's policy to
22  the lender alone.  The lender being a lender under a
23  simultaneous issue of mortgage policy.
24        Do you remember that line of questioning?
25    A   Yes.



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
324—327

Page 324

1    Q    Was it your testimony that that provision
2 permits the insurance company to take such action or
3 requires the insurance company to take such action?
4         MR. WERSANT:  Objection as to form.
5         THE WITNESS:  It permits the insurance company
6 to take that action not only for simultaneous issue
7 of mortgages but any mortgage that the insured has
8 executed or agreed to.
9 BY MS. CRONIN:
10   Q    Okay.  So even if there was no lender's policy
11 issued, if you have an owner who makes a claim for loss
12 under an owner's policy, the company has the option to
13 pay instead the mortgagee on the property whether or not
14 that mortgagee is an insured?
15   A    Yes.
16   Q    Is there a similar provision under a lender's
17 policy of title insurance?
18   A    No.
19   Q    I'm going to direct your attention to
20 Exhibit 18 titled "Collateral Assignment of Contract and
21 Contract Rights."  I'm going to direct your attention to
22 the second page -- the last complete paragraph on the
23 second page, the first line.
24        Could you just read that to yourself, please?
25 Actually, go ahead and just read that out loud.

Page 325

1    A    "This agreement is given as collateral
2 security for the payment of promissory notes (note) of
3 the assignor of even date herewith in the sum of
4 $1,300,000 and all other sums secured by the mortgage,
5 including future advances."
6    Q    Okay.  Do you know what the phrase "collateral
7 security" means?
8    A    It's additional security.  It is not
9 necessarily a debt owed to the lender on the mortgage.
10   Q    Okay.
11   A    It's other -- it's additional security in
12 addition to the property.
13   Q    Thank you.
14        Mr. Partin, did you see anything in Old
15 Republic's file, apart from Mr. Wersant's email,
16 accusations that indicated in any manner to you that
17 this case was being delayed by Mr. Marks, by HJH, or by
18 anyone else?  By "this case," I mean the quiet title
19 case.
20        MR. WERSANT:  Objection as to form.
21 BY MS. CRONIN:
22   Q    Do you understand the question?  Do you want
23 me to try it again?
24   A    Yes, please.
25   Q    Yes, sure.

Page 326

1    With respect to Old Republic's claims file --
2 other than Mr. Wersant's emails to Ms. McGinnity
3 suggesting that HJH intends to lose the quiet title
4 case, obtain and pocket the title insurance proceeds --
5 did you see anything in Old Republic's claim file that
6 indicated to you that HJH was delaying, avoiding, or
7 otherwise obstructing prosecution of the quiet title
8 case?
9    A    No.
10   Q    Old Republic received two claims on the
11 lender's policy of title insurance issued in connection
12 with this property, didn't it?
13   A    Yes.
14   Q    Does the policy permit there to be more than
15 one insured claimant?
16        MR. WERSANT:  Objection as to form.
17 BY MS. CRONIN:
18   Q    And I mean the lender's policy.
19   A    Yes, it could.
20   Q    Old Republic doesn't have any release from
21 CypressCoquina Bank, Coquina Bank, or RBC, USANA of any
22 loss that any of them may have suffered in connection
23 with the title issue placed in dispute in the quiet
24 title matter?
25        MR. WERSANT:  Objection as to form.

Page 327

1 BY MS. CRONIN:
2    Q    Is that so?
3    A    No, we have no releases.
4    Q    Do you recall having seen, in connection with
5 your preparation for this deposition or in the
6 allegations in the third amended complaint filed by
7 Kahama in this case, that there was an entity called
8 Landmark Equity I that at one time claimed to hold the
9 mortgage that's insured under the lender's policy
10 originally issued to CypressCoquina?
11        MR. WERSANT:  Objection as to form.
12        THE WITNESS:  Yes.
13 BY MS. CRONIN:
14   Q    Do you recall having received a claim from
15 Landmark under the lender's title policy?
16   A    I don't ever remember receiving an actual
17 claim.  Somewhere along the line we became aware that
18 they had purchased the loan and had filed a foreclosure.
19   Q    I'll direct your attention to Exhibit 25, and
20 specifically within Exhibit 25, to the pages
21 Bates-stamped at the bottom ORNTIC 502 through 504.
22   A    Yes.
23   Q    Do you know who prepared the draft settlement
24 agreement that is attached to page 502?
25        MR. WERSANT:  Objection as to the form.



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
328–331

Page 328

1     THE WITNESS:  I don't know specifically who
2 prepared it.  It came from Mr. Marks' office.  One
3 of his paralegals or secretaries, but I don't know
4 who prepared it.
5 BY MS. CRONIN:
6     Q    Okay.  I want you to compare the draft release
7 that's set forth in pages 503 and 504 of Exhibit 25 with
8 the release agreement that comprises the last three
9 pages of Exhibit 27.  Just briefly, those documents look
10 like one was a draft of the other?
11    A    Now, which one?
12    Q    Either of them.  Do either of them look like
13 they are related or prior drafts to each other?
14    A    No, they are different typeface, so I don't
15 know who prepared this one.  But it doesn't appear to be
16 the same computer system or word processor or typeface.
17    Q    Okay.  And there is nothing in Exhibit 25 or
18 any other document you've seen in Old Republic's files,
19 for that matter, that indicates that there was ever any
20 review or negotiation of this two-page draft settlement
21 agreement pages 503 and 504 in Exhibit 25?
22    A    Sorry.  Would you restate the question?
23    Q    Try it again.  With respect to the draft
24 settlement agreement that's attached as part of
25 Exhibit 25, pages 503 and 504, have you ever seen any

Page 329

1 version of this document, ever commented upon, revised,
2 redlined, discussed, exchanged, other than the single
3 transmittal that we see here as part of Exhibit 25?
4     A    I don't believe so, no.
5     Q    Do you have any reason to believe that the
6 plaintiff, Kahama, has suffered any loss in connection
7 with the title matter in dispute and in the quiet title
8 case?
9         MR. WERSANT:  Objection as to form.
10         THE WITNESS:  Well, they may have suffered a
11    loss, but the issue is whether the loss is
12    compensable under the title policy.
13 BY MS. CRONIN:
14    Q    Okay.  Let me try that again.  I thought I
15 said "compensable."  Maybe I didn't.
16        Have you seen anything to indicate that
17 plaintiff, Kahama, has suffered any compensable loss
18 under the loan policy of the title insurance that's in
19 dispute in this case?
20        MR. WERSANT:  Objection as to form.
21        THE WITNESS:  Not at this point.
22        MS. CRONIN:  I think that's it for me.
23        MR. AGLIANO:  Mr. Partin, I just have a few
24    questions.  As you know, I represent Howard Marks in
25    this case.

Page 330

1              EXAMINATION
2 BY MR. AGLIANO:
3     Q    First, I'd ask you to look at Exhibit 3
4 entitled "Lender Title Policy," specifically, Schedule
5 B(1), Exception Number 1.
6         Correct me if I'm wrong, that exception
7 provides that Old Republic will not -- does not insure
8 the lender against loss or damages arising from taxes
9 for the year 2004, and any taxes and assessments levied
10 or assessed subsequent to the day of the policy, which
11 was in 2004; correct?
12        MR. WERSANT:  I'll object and also move to
13    strike, because I don't believe Marks has standing
14    to participate in this deposition.
15 BY MR. AGLIANO:
16    Q    Subject to that, you can go ahead and answer,
17 Mr. Partin.
18    A    That's correct.
19    Q    Are there any circumstances under which, in
20 light of that special exception, Old Republic would be
21 liable to Kahama as a predecessor to Coquina Bank for
22 any property taxes accruing or assessed subsequent to
23 2004?
24    A    It would not be responsible for the taxes
25 themselves, but if the taxes can be included in the

Page 331

1 indebtedness secured by the mortgage and the policy loss
2 is adjusted under paragraph 7(a)(ii), it would be
3 included as part of the indebtedness.  So it would be
4 compensable.
5     Q    I just wanted to clarify that.  Relative to
6 the total amount of fees and costs that Old Republic has
7 incurred to litigate the quiet title action to
8 administer the claims, you mentioned a $750,000 figure
9 being an approximate amount that included the three law
10 firms.  I think you said three law firms being
11 Mr. Marks' firm and the two coverage counsel firms?
12    A    Yes.
13    Q    Did that also include the Trenam Kemker firm
14 to litigate this case?
15    A    Part of it, yes.
16    Q    Okay.  So that approximate $750,000 estimate
17 would actually include all four law firms?
18    A    That's correct.
19    Q    It would have in fact included a fifth law
20 firm being Mr. Marks' predecessor firm, Graham Builder,
21 too; correct?
22    A    Yes.
23    Q    So I thought I heard you say something to the
24 effect that you thought 90 percent of that aggregate
25 amount had been paid to Burr & Forman -- roughly, I know



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
332–335

Page 332

1 you don't have a figure in front of you -- is that an
2 accurate statement?
3    A    No, I don't think I said 90 percent.  I think
4 that was Mr. Wersant's suggestion.  I just don't know.
5    Q    You don't have any idea as you sit here today,
6 correct, without going back and looking at the records?
7    A    That's correct.
8    Q    Even the $750,000 amount is an estimate based
9 on your recollection without having specifically
10 reviewed any particular records in preparation for
11 today's deposition; correct?
12    A    I think I said it was --
13         MR. WERSANT:  Objection as to form.
14         THE WITNESS:  -- north of 750,000.
15 BY MR. AGLIANO:
16    Q    Ms. Cronin asked you if you had seen anything
17 in the Old Republic file, other than Mr. Wersant's email
18 accusations, that HJH was delaying, avoiding, or
19 otherwise obstructing the prosecution of the title case,
20 and you testified, no, you had not; correct?
21    A    That's correct.
22    Q    Are you aware of any other facts which would
23 tend to prove that HJH was, in fact, intentionally
24 delaying, avoiding, or otherwise obstructing the
25 prosecution of the title case?

Page 333

1    A    I haven't seen anything in Old Republic's
2 file, no.
3    Q    Other than what you've seen in Old Republic's
4 file, are you aware of any facts from any other source
5 that would indicate that?
6         MS. CRONIN:  I'll object to the extent that
7    could call for attorney-client privileged
8    communications.
9 BY MR. AGLIANO:
10    Q    Other than what you've learned from your
11 attorneys -- of course, which would be privileged
12 communications -- are you aware of any facts from any
13 other source, any nonprivileged source, which would
14 indicate that HJH has potentially delayed, avoided, or
15 obstructed the prosecution of the title case?
16    A    Not any specific facts, no.
17    Q    Similarly, are you aware of any facts which
18 would tend to prove that Howard Marks intentionally
19 delayed, avoided, or otherwise obstructed the
20 prosecution of the title case?
21    A    No, I'm not.
22    Q    You said you were familiar with -- earlier
23 that Mr. Marks had been sued on a fraudulent conveyance
24 theory relative to the $100,000 settlement that HJH
25 received from the city.

Page 334

1         Are you aware of any facts -- strike that.
2         Is Old Republic aware of any facts which would
3 tend to prove that Mr. Marks intended to hinder, delay,
4 or defraud Kahama from their collection efforts by
5 deliberately concealing that settlement?
6         MR. WERSANT:  Objection as to form.
7         THE WITNESS:  No, I am not.
8 BY MR. AGLIANO:
9    Q    Are you aware of any facts that would tend to
10 support any aspect of Kahama's fraudulent conveyance
11 claim against Mr. Marks?
12         MR. WERSANT:  Objection as to form.  And
13    that's outside the scope of the notice as well.
14 BY MR. AGLIANO:
15    Q    Subject to that, you may answer.
16    A    No, I'm not.
17    Q    Are you aware of any facts that would tend to
18 prove or evidence of any conspiracy by Mr. Marks and
19 either of his law firms and any of the HJH defendants to
20 interfere with Kahama's relationships with its borrower,
21 its guarantors, or with Old Republic?
22    A    No, I'm not aware of any.
23         MR. AGLIANO:  I don't have any other questions
24    at this time.  Thank you.
25         MR. WERSANT:  I have a couple.

Page 335

1              EXAMINATION
2 BY MR. WERSANT:
3    Q    Let me ask you something.  Mr. Partin,
4 Mrs. Cronin, the attorney here, asked -- there's an
5 attorney handling -- as the attorney in the quiet title
6 case, did Mr. Marks and Burr & Forman also represent Old
7 Republic's interest?
8    A    No.
9         MR. AGLIANO:  Form.
10         MS. CRONIN:  Objection to form.
11 BY MR. WERSANT:
12    Q    So you're not aware of any case law under
13 Florida law that would indicate otherwise?
14         MS. CRONIN:  Objection to form.
15         MR. AGLIANO:  Object to the form.
16         THE WITNESS:  No, I'm not aware of any case
17    law that would say they were acting in our interest.
18 BY MR. WERSANT:
19    Q    You're not aware -- and you're not aware of
20 any Florida Rules of Professional Conduct that would
21 indicate otherwise?
22         MS. CRONIN:  Objection to form.
23         MR. AGLIANO:  Form.
24         THE WITNESS:  No, I'm not aware of any.
25 BY MR. WERSANT:



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
336–339

Page 336

1    Q    Have you actually -- but you're not licensed
2  in Florida, though; right?
3    A    No, I'm not.
4    Q    So you don't -- you may not know?
5        MR. AGLIANO:  Form.
6        MS. CRONIN:  He just testified he doesn't
7  know.
8        THE WITNESS:  That's correct, I don't know.
9  BY MR. WERSANT:
10   Q    You testified before -- you testified before
11 that one of the purposes of the quiet title case is to
12 establish fee title as to HJH; correct?
13       MS. CRONIN:  Objection to form.
14       MR. AGLIANO:  Same.
15       THE WITNESS:  The objection was to cure title.
16 BY MR. WERSANT:
17   Q    When you say "cure title," what does that
18 mean?  Result in fee title?
19   A    Yes.
20   Q    Fee simple title?
21   A    Well, title as insured.
22       MR. WERSANT:  All right.  What exhibit are we
23 on?
24       THE REPORTER:  34.
25       (Exhibit Number 34 was marked for

Page 337

1    identification.)
2        MR. WERSANT:  This is ORNTIC 17.
3  BY MR. WERSANT:
4    Q    Mr. Partin, have you seen this document
5  before?
6    A    Yes.
7    Q    What is that document?  Can you identify that
8  document for the record?
9    A    I believe this is the warranty deed from
10 Strategica to HJH.
11   Q    Doesn't that deed indicate that the fee title
12 to this property vested in HJH in 2004?
13   A    Well, it conveys or purports to convey the fee
14 title in 2004.
15   Q    In 2004.  Four years before the quiet title
16 lawsuit was filed; correct?
17   A    Yes, approximately.
18   Q    So ten years later, the court has entered a
19 judgment saying that HJH has fee title and granting the
20 county a dedication on this property; correct?
21       MS. CRONIN:  Objection to form.
22       MR. AGLIANO:  Form.
23       THE WITNESS:  The court has entered an order.
24 BY MR. WERSANT:
25   Q    Isn't that what the order says?

Page 338

1        MS. CRONIN:  Objection.
2        MR. AGLIANO:  Form.
3        THE WITNESS:  In general, yes.
4  BY MR. WERSANT:
5    Q    You would also agree that HJH -- aside from
6  this redundant declaration of fee title, HJH did not
7  prevail in any of its claims in the title case; correct?
8        MR. AGLIANO:  Form.
9        MS. CRONIN:  Objection to form.
10       THE WITNESS:  No, I disagree.  It did prevail
11   in the fee title.
12 BY MR. WERSANT:
13   Q    It lost on the slander of title; correct?
14       MS. CRONIN:  Objection to form.
15       THE WITNESS:  I -- yes.
16 BY MR. WERSANT:
17   Q    Howard Marks also voluntarily dismissed the
18 claim in the inverse condemnation, didn't he?
19       MS. CRONIN:  Objection to form.
20       MR. AGLIANO:  Object to form.
21       THE WITNESS:  I don't recall.
22 BY MR. WERSANT:
23   Q    You also recall that the civil rights claim
24 under the U.S. Federal Code was also dismissed by the
25 court on the county's motion for summary judgment?

Page 339

1        MS. CRONIN:  Objection to form.
2        MR. AGLIANO:  Same.
3        THE WITNESS:  I really didn't review that.
4  BY MR. WERSANT:
5    Q    How about the equitable estoppel?  What was
6  the disposition of that claim in the quiet title case?
7        MS. CRONIN:  Objection to form.
8        THE WITNESS:  I don't recall.
9  BY MR. WERSANT:
10   Q    Well, did you not review that file -- did you
11 not review the file regarding the status of the quiet
12 title case before coming to this deposition today?
13       MS. CRONIN:  Objection to form.
14       MR. AGLIANO:  Join.
15       THE WITNESS:  I didn't review all the filings.
16 I reviewed the judgment --
17       MR. WERSANT:  Right.
18       THE WITNESS:  -- and the complaint.
19 BY MR. WERSANT:
20   Q    Well, I guess, Mr. Partin, at this point HJH
21 had a judgment that says it has fee simple title of the
22 property, which is all they had ten years ago.  So how
23 was the title in a better status now than it was ten
24 years ago --
25       MR. AGLIANO:  Object to form.



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
340–343

Page 340

1    MS. CRONIN:  Objection to form.
2  BY MR. WERSANT:
3    Q    -- due to this lawsuit?
4    MS. CRONIN:  Same objection.
5    MR. AGLIANO:  Same.
6    THE WITNESS:  I don't understand the question.
7  The title was insured, and the city and county made
8  claims that part of the title was not owned by the
9  insured, and we attempted to cure that title.
10  BY MR. WERSANT:
11    Q    Well, you'd also agree, though, that prior to
12  this litigation, there wasn't -- there wasn't an
13  easement by the City of New Smyrna running across this
14  property, was there?
15    MS. CRONIN:  Objection to form.
16    MR. AGLIANO:  Join.
17  BY MR. WERSANT:
18    Q    There was not a recorded easement as to this
19  property?
20    A    There was not a recorded easement, no.
21    Q    And now there is?
22    MS. CRONIN:  Objection to form.
23    MR. AGLIANO:  Same.
24    THE WITNESS:  There is an order that is
25  subject to an easement in favor of the public.

Page 341

1  BY MR. WERSANT:
2    Q    I'm not talking about the county.  I'm talking
3  about the settlement agreement that HJH had executed
4  with the city.
5    MS. CRONIN:  Objection to form.
6    MR. AGLIANO:  Join.
7    THE WITNESS:  There was an easement -- and it
8  affected the property -- agreed to by HJH, yes.
9  BY MR. WERSANT:
10    Q    Well, are you also aware that Kahama had an
11  appraisal done regarding the property?
12    MS. CRONIN:  Objection to form.
13    THE WITNESS:  Yes.
14    MR. AGLIANO:  Join.
15  BY MR. WERSANT:
16    Q    You're also aware that that appraisal has
17  indicated that that easement had actually reduced the
18  value of the property from $900,000 to $522,000.
19    MS. CRONIN:  Is that a question?
20  BY MR. WERSANT:
21    Q    Are you aware of that?
22    MS. CRONIN:  Objection to form.
23    MR. AGLIANO:  Join.
24    THE WITNESS:  I was not aware of the specific
25  dollar numbers.

Page 342

1  BY MR. WERSANT:
2    Q    Would you also -- you would also agree that
3  you were provided with a copy of that appraisal on or
4  about March 6, 2014?
5    A    Yes.
6    MS. CRONIN:  Objection to form.
7  BY MR. WERSANT:
8    Q    And you have not reviewed it?
9    MS. CRONIN:  Object to form.
10    THE WITNESS:  Yes, I've reviewed it.
11  BY MR. WERSANT:
12    Q    Has Old Republic conducted its own appraisal
13  regarding the value of the property at this point?
14    MS. CRONIN:  I'm going to object based on work
15  product.  We haven't designated any experts.
16  BY MR. WERSANT:
17    Q    So Old Republic has not conducted any
18  appraisals of this property?
19    MS. CRONIN:  I'm going to restate the
20  objection, and I would object to -- you're talking
21  about work product.
22    MR. WERSANT:  Well, you were asking this
23  witness to provide his opinion about valuation.  So
24  he can answer the question.
25    MS. CRONIN:  I beg your pardon?

Page 343

1    MR. WERSANT:  You've asked him to provide his
2  estimate as to our damages and valuation.
3  BY MR. WERSANT:
4    Q    So what's your opinion as to --
5    MS. CRONIN:  I did?
6    MR. WERSANT:  Yes, you did.
7    MS. CRONIN:  Ask your question.  I have no
8  idea what you're talking about.  I hadn't asked that
9  question.
10  BY MR. WERSANT:
11    Q    Has Old Republic conducted an appraisal of
12  this property?
13    MS. CRONIN:  Are you talking about in
14  connection with this lawsuit?
15    MR. WERSANT:  Period.
16    MS. CRONIN:  Yes or no?  I want to
17  know whether to assert a work product objection.
18    MR. WERSANT:  I'm asking if they've
19  conducted an appraisal -- if he has conducted -- if
20  they have conducted an appraisal of this property at
21  all, aside from the initial one done in 2004.
22    MS. CRONIN:  Okay.  Go ahead and answer.
23    THE WITNESS:  No.
24  BY MR. WERSANT:
25    Q    So, as we sit here today, you have no idea



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
344–347

Page 344

1  what the fair market value of the property would be at
2  this point, do you?
3       MS. CRONIN:  Objection to form.
4       THE WITNESS:  No, but that's not necessarily
5  what we deal with.  We deal with the diminution in
6  value in assessing the claim.
7  BY MR. WERSANT:
8    Q    How would you determine the diminution in
9  value of the property?
10      MS. CRONIN:  Objection to form.
11      THE WITNESS:  You would get an appraisal first
12  as to the value of the property as though no
13  easement existed, and you would then get an
14  appraisal of the property as diminished by the
15  easement affecting the property; and the difference
16  between those two appraisals would be the amount
17  that was possibly payable under the policy.
18  BY MR. WERSANT:
19    Q    Correct.  And the appraisal that Kahama
20  provided, would you agree that it provided such a figure
21  in that appraisal?
22      MS. CRONIN:  Objection to form.
23      THE WITNESS:  No, it does not.
24  BY MR. WERSANT:
25    Q    The appraisal does not provide that figure?

Page 345

1    A    No.
2    Q    All right.  If Old Republic -- if the quiet
3  title case is ultimately dismissed, would Old Republic
4  also be responsible for paying the county's fees and
5  costs that it seeks to currently levy against the
6  property?
7       MS. CRONIN:  Objection to form.
8       MR. AGLIANO:  Join.
9       THE WITNESS:  Which fees?
10  BY MR. WERSANT:
11    Q    Seeking its fees under the dismissed civil
12  rights claim that Howard Marks brought as part of this
13  quiet title case.
14      MS. CRONIN:  Same objection.
15  BY MR. WERSANT:
16    Q    Under the federal shifting statute.
17      MS. CRONIN:  Same objection.
18      MR. AGLIANO:  Join.
19  BY MR. WERSANT:
20    Q    So would Old Republic be responsible for
21  satisfying those claims for fees and costs if they
22  reduced the judgment against the property?
23      MS. CRONIN:  Object to form.
24      MR. AGLIANO:  Join.
25      THE WITNESS:  I don't know who that judgment

Page 346

1  is against, if it's against Kahama --
2  BY MR. WERSANT:
3    Q    Well, currently it would be against whoever
4  has title to the property.  So I'm just clarifying that.
5       So if that judgment is entered against the
6  property, would Old Republic satisfy that judgment?
7       MS. CRONIN:  Objection to form.
8       MR. AGLIANO:  Join.
9       THE WITNESS:  Well, that could be foreclosed
10  out, though, I would think, by Kahama's lien
11  foreclosure.
12  BY MR. WERSANT:
13    Q    That would also require Kahama to file a
14  foreclosure action against the County of Volusia,
15  wouldn't it?
16      MS. CRONIN:  Objection to form.
17      THE WITNESS:  Well, you have to add them to
18  the current foreclosure, I believe.
19  BY MR. WERSANT:
20    Q    Would you also agree that Kahama is going to
21  incur additional costs and expenses in doing so --
22      MS. CRONIN:  Objection.
23  BY MR. WERSANT:
24    Q    -- in amending its complaint to add the
25  county?

Page 347

1       MS. CRONIN:  Objection to form.
2       THE WITNESS:  It might.
3  BY MR. WERSANT:
4    Q    So to foreclose the county's interest out,
5  would that be a covered event under the lender's policy?
6       MS. CRONIN:  Objection to form.
7       MR. AGLIANO:  Join.
8       THE WITNESS:  Normally, it would be a cost
9  associated with the collection of the debt, which is
10  really not collectible under the policy.  I would
11  have to review it, though.  I've not considered that
12  before.
13  BY MR. WERSANT:
14    Q    Well, let me ask you -- and let me ask you
15  something else, Mr. Partin.  Are you aware of a status
16  conference hearing that was conducted in the quiet title
17  case on or about August 23rd, 2013?
18    A    I don't recall that, no.
19    Q    You don't recall it specifically?
20      To your knowledge, there's nothing in the file
21  indicating that the court had -- I'm talking about the
22  judge in the quiet title case, Judge Rouse -- but he had
23  stated something to the effect that he wondered why HJH
24  was suing the county and why the county was suing them
25  on the counterclaim.

JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
348–351

Page 348

1    A    No, I'm not aware of that.
2    Q    And he did not understand the purpose of a
3  quiet title lawsuit.
4        MS. CRONIN:  Is that a question?
5  BY MR. WERSANT:
6    Q    I mean, are you aware of the fact that the
7  judge expressed -- his view that he didn't understand
8  the purpose of this quiet title case?
9    A    No, I'm not.
10   Q    And are you aware of the fact, also, during
11  that hearing that -- hold on.
12        And are you aware of the fact that during that
13  hearing, the court said that it made a determination
14  there was no justiciable issue here because nobody asked
15  to build anything, nobody's building anything, no permit
16  has been issued to build anything?  We have two sides
17  wrangling over if and when they decide to build
18  something, what they are going to build, and is the
19  county going to sue them.
20        Are you aware that the court had expressed
21  those concerns, that he's basically being asked to
22  render an advisory opinion in this case?
23        MS. CRONIN:  Objection.
24        MR. AGLIANO:  Join.
25        THE WITNESS:  No, I'm not.

Page 349

1  BY MR. WERSANT:
2    Q    Do you know what the term "advisory opinion"
3  means?
4        MS. CRONIN:  Objection to form.
5        MR. AGLIANO:  Join.
6        THE WITNESS:  Not technically, no.
7  BY MR. WERSANT:
8    Q    Do you understand the requirement under
9  Florida law that there be a justiciable case or
10  controversy before the court to bring a lawsuit?
11        MS. CRONIN:  Objection.
12        MR. AGLIANO:  Form.
13        THE WITNESS:  Generally, but I'm not sure of
14    the absolute specifics and requirements.
15  BY MR. WERSANT:
16   Q    So Old Republic was not aware of the fact that
17  the court thought this case was just some hypothetical
18  dispute over some imaginary issue that it hadn't heard
19  yet?
20        MS. CRONIN:  Objection to form.
21        MR. AGLIANO:  Same.
22        THE WITNESS:  No, I was not.
23  BY MR. WERSANT:
24   Q    If Old Republic had been aware of the judge's
25  concerns in this regard, would it have proceeded with

Page 350

1  this lawsuit?
2        MS. CRONIN:  Objection to form.
3        MR. AGLIANO:  Join.
4        THE WITNESS:  I don't know.  I'd have to
5    review it.
6  BY MR. WERSANT:
7    Q    In the final judgment -- and it's somewhere
8  over here -- there's also several cases cited in that
9  judgment.  Have you reviewed any of those cases,
10  Mr. Partin, any of those Florida cases regarding issues
11  or similar issues regarding surrounding properties like
12  this one?
13        MS. CRONIN:  Objection to form.
14        MR. AGLIANO:  Join.
15        THE WITNESS:  I don't recall if I have or not.
16  BY MR. WERSANT:
17   Q    Would you have expected that Old Republic's
18  outside counsel would have advised Old Republic of legal
19  authority directly adverse to the claims brought --
20  adverse to his position in this case?
21        MS. CRONIN:  Objection to form.
22        MR. AGLIANO:  Join.
23        THE WITNESS:  I don't know that our coverage
24    counsel has seen that either.
25  BY MR. WERSANT:

Page 351

1    Q    How about your outside -- well, how about your
2  outside counsel --
3        MS. CRONIN:  Same objection.
4  BY MR. WERSANT:
5    Q    -- Mr. Marks?
6        MS. CRONIN:  Same objection.
7        THE WITNESS:  He's not my outside counsel.
8    He's retained for the insured.
9  BY MR. WERSANT:
10   Q    Right.  But would you expect that outside
11  counsel would also indicate to Old Republic if there was
12  legal authority that contradicted the claims brought in
13  this case?
14        MS. CRONIN:  Objection to form.
15        MR. AGLIANO:  Join.
16        THE WITNESS:  I would expect him to advise us
17    of the court's concerns.
18  BY MR. WERSANT:
19   Q    Were you also aware of the fact that Mr. Marks
20  had conversations with Landmark Equity Fund,
21  representatives and attorneys for that entity, on or
22  about January 16th, 2009, March 4th, 2009, June 25th,
23  2009?
24        MS. CRONIN:  I'm going to interpose an
25    objection here that this goes well outside the scope



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
352–355

Page 352

1  of cross, but we're going to give a little bit of
2  leeway. I will object to the form of the question.
3  The witness can answer if he knows the answer.
4      MR. AGLIANO: I'll join the objection.
5      MR. WERSANT: One thing I would note is
6  Ms. Cronin had an extensive line of questioning
7  where she asked if Old Republic was aware of any
8  efforts made by Marks to delay this case.
9  BY MR. WERSANT:
10  Q   Landmark Equity Fund was specifically
11  mentioned there. So we have three communications
12  between Marks and our predecessor-in-interest. Was Old
13  Republic aware of those communications?
14      MS. CRONIN: I'm going to restate my
15  objections without stating them on the record. I'll
16  just incorporate them by reference.
17      MR. AGLIANO: Join.
18      MS. CRONIN: The witness can answer the
19  question if he knows.
20      MR. AGLIANO: Rejoin.
21      THE WITNESS: I don't recall seeing that.
22  BY MR. WERSANT:
23  Q   And Old Republic would not have any knowledge
24  that Mr. Marks repeatedly claimed to Landmark and its
25  representatives that this case would be resolved in a

Page 353

1  matter of months?
2      MS. CRONIN: Same objection.
3      MR. AGLIANO: Join.
4  BY MR. WERSANT:
5  Q   Is there nothing in your file regarding that
6  either?
7      MR. AGLIANO: Join the objection.
8      THE WITNESS: I don't recall seeing that to
9  Landmark Equity Fund.
10  BY MR. WERSANT:
11  Q   Is that something that Old Republic would have
12  authorized Howard Marks to indicate to the lender's
13  attorneys or their representatives?
14      MS. CRONIN: Objection to form.
15      MR. AGLIANO: Join.
16      THE WITNESS: I wouldn't authorize it or
17  unauthorize it. I don't -- you know, he's an
18  attorney, and he has his opinions. It's not
19  something that we would necessarily tell him to do
20  or not to do.
21  BY MR. WERSANT:
22  Q   Have you ever had -- have you -- in your
23  experience in handling title claims in Florida, have you
24  ever known a lender to refrain from foreclosing while
25  there is a title curative litigation on the property?

Page 354

1      MS. CRONIN: Objection to form.
2      MR. AGLIANO: Join.
3      THE WITNESS: Yes. I can't give you a
4  specific case but I've had it happen quite a few
5  times.
6  BY MR. WERSANT:
7  Q   Why would they refrain from foreclosing during
8  the title curative litigation, in your experience?
9      MR. AGLIANO: Form.
10      MS. CRONIN: Objection to form.
11      THE WITNESS: They just would want to see if
12  it could be resolved other than by foreclosure.
13  BY MR. WERSANT:
14  Q   And in your experience, how typically were
15  those cases resolved?
16      MR. AGLIANO: Form.
17      MS. CRONIN: Objection to form.
18      THE WITNESS: Usually, they are cases where we
19  are going to get a curative deed, and we will get
20  the curative deed to the insured lender so that they
21  don't have to go through a foreclosure.
22  BY MR. WERSANT:
23  Q   And in this case, that wasn't possible?
24      MS. CRONIN: Objection to form.
25      THE WITNESS: It might have been possible. I

Page 355

1  know there was some conversations about a deed in
2  lieu from HJH to one of those lenders.
3  BY MR. WERSANT:
4  Q   You mentioned about -- one other question.
5  You mentioned here that the taxes paid by Kahama to
6  protect its lien interest could be compensable under the
7  title insurance policy if the taxes paid will become
8  part of the debt; correct?
9      MS. CRONIN: Objection to form.
10      MR. AGLIANO: Join.
11      THE WITNESS: And if that particular provision
12  was the provision that the policy loss was
13  determined.
14  BY MR. WERSANT:
15  Q   Right. Are you aware of the fact that
16  Mr. McMillan, the principal guarantor of HJH in this
17  case, had claimed at a deposition conducted in March
18  of 2013 that HJH was paying the taxes on this property?
19      MS. CRONIN: Objection to form.
20      MR. AGLIANO: Form.
21      THE WITNESS: I don't know. I don't recall
22  that. I don't know what Mr. McMillan said at his
23  deposition.
24  BY MR. WERSANT:
25  Q   Well, then I suppose you're not also aware of



Page 356

1  the fact that -- Mr. McMillan through deposition --
2  because he was saying, well, if Kahama has paid the
3  taxes, then we're going to be liable for that under the
4  loan?
5          MR. AGLIANO:  Form.
6          THE WITNESS:  Objection to form.
7  BY MR. WERSANT:
8      Q    You're not aware of that, are you?
9          MS. CRONIN:  Same objection.
10         THE WITNESS:  No.
11  BY MR. WERSANT:
12     Q    But would you also agree under this mortgage
13  that the amounts Kahama paid to advance the taxes can
14  become part of the indebtedness?
15         MS. CRONIN:  Objection to form.
16         MR. AGLIANO:  Form.
17  BY MR. WERSANT:
18     Q    That they can tax those back to the borrower?
19         MS. CRONIN:  Same objection.
20         THE WITNESS:  Yes, I believe that's correct.
21  BY MR. WERSANT:
22     Q    Are you also aware of the fact -- are you
23  also -- is Old Republic also aware of the fact that last
24  year, Judge Moody, the judge in this federal case,
25  ordered the borrowers to pay the taxes due on this

Page 357

1  property?
2          MS. CRONIN:  Objection to form.
3          MR. AGLIANO:  Join.
4          THE WITNESS:  Yes, I'm aware of that.
5  BY MR. WERSANT:
6      Q    $245,000?
7      A    Yes, I'm aware of that.
8      Q    Which they have not done?
9          MS. CRONIN:  Objection to form.  Is that a
10  question?
11         MR. WERSANT:  Yes.
12  BY MR. WERSANT:
13     Q    Are you aware they have not done that?
14         MS. CRONIN:  Same objection.
15         THE WITNESS:  I understand they haven't, from
16  you.
17         MR. WERSANT:  Nothing else.
18         MS. CRONIN:  I only have one followup.  I'm
19  sorry.
20         EXAMINATION
21  BY MS. CRONIN:
22     Q    I'm going to refer back again to Exhibit 25,
23  the settlement agreement.  It is here, albeit in draft,
24  beginning at pages 507 through the end.  And you and
25  Mr. Wersant -- or Mr. Wersant was asking questions about

Page 358

1  an easement that was imposed by the settlement
2  agreement.  Do you recall that?  An easement --
3      A    Yes.
4      Q    Okay.  I'm going to direct your attention to
5  Exhibit A to that settlement agreement beginning at
6  ORT 516, 517 through 520.  Do you see that document?
7  What's it titled?
8      A    Declaration of Restrictive Covenants.
9      Q    Okay.  Why don't you take a look through that
10  document.  Take your time.  I want you to tell me if
11  there's a grant of easement in that document or anything
12  that purports to be a grant of easement in that
13  document.
14     A    No, it's not an easement.  It's a covenant
15  running with the land that restricts the use of the land
16  or part of the land.
17         MS. CRONIN:  Okay.  Anything else?
18         MR. AGLIANO:  One final question, Mr. Partin.
19         EXAMINATION
20  BY MR. AGLIANO:
21     Q    This goes to the 1983 judgment for costs
22  Mr. Wersant was talking about.  If in fact the county
23  does obtain a judgment for their fees and costs that
24  becomes an in rem judgment against the property and
25  Kahama has a pending notice of lis pendens that was

Page 359

1  recorded before entry of that judgment, would not the
2  lis pendens cut off the county's rights such that they
3  would not have to name them as a party to the lawsuit?
4          MR. WERSANT:  Objection as to form.
5          THE WITNESS:  I don't know.  It's possible.
6  BY MR. AGLIANO:
7      Q    So it wouldn't be absolutely a truism, then,
8  that under those circumstances, Kahama would have to
9  amend their lawsuit to add the county as a defendant;
10  there would have to be some other facts to consider
11  whether they have to do that; correct?
12         MR. WERSANT:  Objection as to form.
13         THE WITNESS:  That's a possibility, yes.
14         MR. AGLIANO:  All right.  Nothing further.
15         MS. CRONIN:  Okay.  We will -- are we done?
16         MR. WERSANT:  We're done.
17         MS. CRONIN:  We will read.
18         Are you ordering his dep?
19         MR. WERSANT:  Oh, yeah.
20         MS. CRONIN:  If he's ordering, then I'd like a
21  copy, please.
22         MR. AGLIANO:  I have to check with Mr. Marks.
23         (At 7:26 p.m., the deposition was
24  adjourned.)
25

JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
360–363

## Page 360

CERTIFICATE OF REPORTER

STATE OF FLORIDA        )

COUNTY OF HILLSBOROUGH)

I, Ella Dean Sampson, RDR, certify that I was authorized to and did stenographically report the deposition of JAMES D. PARTIN; that a review of the transcript was requested; and that the foregoing pages are a true and complete record of my stenographic notes taken during said deposition.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 20th day of April, 2014.

_____
Ella Dean Sampson, RDR

## Page 361

CERTIFICATE OF OATH

STATE OF FLORIDA        )

COUNTY OF HILLSBOROUGH)

I, the undersigned authority, certify that JAMES D. PARTIN personally appeared before me and was duly sworn on April 8, 2014.

WITNESS my hand and official seal this 20th day of April, 2014.

_____
ELLA DEAN SAMPSON, RDR
Notary Public
State of Florida at Large
My Commission Number: EE065591
Expires: February 17, 2015

## Page 362

DEPOSITION ERRATA SHEET

Our Assignment No:      119685(B)

Case Caption:           Kahama VI v. HJH LLC, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ___ day of _____, 20___.

_____
JAMES D. PARTIN

## Page 363

DEPOSITION ERRATA SHEET

Page No.____ Line No.____ Change to: _____
Reason for change:_____
Page No.____ Line No.____ Change to: _____
Reason for change:_____
Page No.____ Line No.____ Change to: _____
Reason for change:_____
Page No.____ Line No.____ Change to: _____
Reason for change:_____
Page No.____ Line No.____ Change to: _____
Reason for change:_____
Page No.____ Line No.____ Change to: _____
Reason for change:_____
Page No.____ Line No.____ Change to: _____
Reason for change:_____
Page No.____ Line No.____ Change to: _____
Reason for change:_____
Page No.____ Line No.____ Change to: _____

SIGNATURE:_____ DATE:_____
      JAMES D. PARTIN



JAMES D. PARTIN Volume 2
KAHAMA VI vs. HJH LLC

April 08, 2014
364

```
 1          DEPOSITION ERRATA SHEET                  Page 364
 2   Page No._____Line No._____Change to: _____
 3   Reason for change:_____
 4   Page No._____Line No._____Change to: _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to: _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to: _____
 9   Reason for change:_____
10   Page No._____Line No._____Change to: _____
11   Reason for change:_____
12   Page No._____Line No._____Change to: _____
13   Reason for change:_____
14   Page No._____Line No._____Change to: _____
15   Reason for change:_____
16   Page No._____Line No._____Change to: _____
17   Reason for change:_____
18   Page No._____Line No._____Change to: _____
19   Reason for change:_____
20   Page No._____Line No._____Change to: _____
21   Reason for change:_____
22   Page No._____Line No._____Change to: _____
23
     SIGNATURE:_____DATE:_____
24
             JAMES D. PARTIN
25
```



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No: 8:11-CV-02029-JSM-TBM

KAHAMA VI, LLC,

       Plaintiff,

v.

HJH LLC; ROBERT E. W. MCMILLAN, III;
WILLIAM R. RIVEIRO; JOHN BAHNG;
HOWARD S. MARKS; KEVIN P. DONAGHY;
and OLD REPUBLIC NATIONAL TITLE
INSURANCE COMPANY,

       Defendants.

_____/

**DEPOSITION ERRATA SHEET FOR
DEPOSITION OF JAMES D. PARTIN
Volume 2 of 2**

**April 8, 2014
at 10:06 A.M. to 7:26 P.M.**

1.    **DEPOSITION ERRATA SHEET**
2.    **Page No.** _217_    **Line No.** _11_    **Change to** _"their" to "other"_
3.    **Reason for change:** _error in transcript_
4.    **Page No.** _271_ **Line No.** _7_ **Change to:** _"They" to "we"_
5.    **Reason for change:** _error in transcript_
6.    **Page No.** _279_ **Line No.** _22_ **Change to:** _claims "to" title_
7.    **Reason for change:** _error in transcript_
8.    **Page No.** _285_ **Line No.** _23_ **Change to:** _we are "not" responsible_
9.    **Reason for change:** _error in transcript_
10.   **Page No.** _336_ **Line No.** _15_ **Change to:** _The "objective"_
11.   **Reason for change:** _error in transcript_
12.   **Page No.** _____ **Line No.** _____ **Change to:** _____
13.   _____
14.   **Reason for change:** _____
15.   **Page No.** ___ **Line No.** _____ **Change to:** _____
16.   _____
17.   **Reason for change:** _____
18.   **Page No.** __ **Line No.** _____ **Change to:** _____
19.   _____

## DEPOSITION ERRATA SHEET

Our Assignment No.   119685(A)

Case Caption:  Kahama VI v. HJH, LLC et al.

### DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have
read the entire transcript of my Deposition taken in the
captioned matter or the same has been read to me, and
the same is true and accurate, save and except for
changes and/or corrections, if any, as indicated by me
on the Deposition Errata Sheet hereof, with the
understanding that I offer these changes as if still
under oath.

Signed on the ___27___ day of ___May___ , 20 _14_ .

_____
James D. Partin